[No. A108235. First Dist., Div. Two. Mar. 28, 2006.]

In re the Marriage of IRWIN R. PEARLSTEIN and JULIE PEARLSTEIN.
IRWIN R. PEARLSTEIN, Appellant, v.
JULIE PEARLSTEIN, Respondent;
CONTRA COSTA COUNTY DEPARTMENT OF CHILD SUPPORT
SERVICES, Intervener and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.C., D., E. and F.

COUNSEL

Garrett C. Dailey for Appellant.

Bernard W. Wolf and Lance A. Russell for Respondent.

Bill Lockyer, Attorney General, Thomas R. Yanger, Assistant Attorney General, Margarita Altamirano and James Ching, Deputy Attorneys General, for Intervener and Respondent.

OPINION

RUVOLO, J.*—

## I.

## INTRODUCTION

Appellant Irwin R. Pearlstein (Irwin)[1] appeals from the family law court's decision to include, as part of his gross income for child support purposes, both cash and the value of stock he received for selling his business. In the published portion of this opinion, we conclude that the trial court erred by including the value of marketable, but unliquidated, stock in the calculation of Irwin's income. In doing so, we reject respondents' contention that the stock Irwin received for the equity in his business is analogous to a stock option commonly used as a form of executive compensation, which generally is considered gross income for support purposes. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283 [111 Cal.Rptr.2d 755] (*Cheriton*).)

In the unpublished portion of this opinion, we conclude the family law judge also erred: (1) in making other calculations pertaining to a determina-

---

*Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Because Irwin and Julie Pearlstein and their daughter all share the same last name, we refer to them by their first names for brevity and clarity.

tion of Irwin's income; (2) in directing Irwin to pay a portion of guideline support for 2004 into a *Chandler* trust[2] for his minor daughter's benefit; and (3) in imposing $5,000 in sanctions against Irwin. Accordingly, we reverse.

## II.

## FACTS AND PROCEDURAL BACKGROUND

Appellant Irwin Pearlstein and respondent Julie Pearlstein were married in October 1988. Their only child, Alexandra, was born on July 10, 1989. Irwin and Julie separated in November 1990, when Alexandra was still an infant. No formal visitation order was entered until much later; instead, for many years the parties handled Alexandra's custody schedule by informal agreement between themselves.

Three years after the parties separated, in November 1993, Irwin was ordered to pay child support in the amount of $800 per month, including childcare costs to be paid directly to the childcare provider, with the balance going directly to Julie. At the time, Irwin was apparently experiencing financial difficulties; he owed a considerable sum in back taxes, and had been the victim of embezzlement perpetrated by his accountant. By the time the November 1993 order was entered, Irwin was admittedly $10,000 in arrears on his child support. The court permitted him to defer paying it for a year in order to clear up his obligation for back taxes first.

Within a couple of months after the entry of the November 1993 child support order, Irwin's business failed, and in January 1994, he began working as a consultant for a new business, Professional Resource Screening, Inc. (PRSI), which his adult children from a former marriage were in the process of establishing. Irwin initially received no compensation from PRSI, but later earned a salary of $2,000 per month. During 1994, Irwin filed for bankruptcy, and moved to modify his child support, which was reduced to a total of $741 per month effective as of June 1994.

During the period between June 1994 and June 2001, Irwin continued to work for PRSI. In 1997, he remarried and moved into a home owned by his new wife. In late 1999, Irwin's children made him a gift of 51 percent of the stock of PRSI. Meanwhile, Alexandra entered middle school, and Irwin began picking her up regularly after school and taking responsibility for helping her with her homework. He also paid directly for at least some of the expenses of her healthcare and extracurricular activities, including religious school to prepare Alexandra for her bat mitzvah.

---

[2] *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124 [70 Cal.Rptr.2d 109].

During the period from 1994 to 2001, it appears that Irwin paid some of his child support, but not all, and by 2001, a significant arrears had accumulated. In May or June 2001, Julie opened a child support collection case with the Contra Costa County Department of Child Support Services (DCSS). In August 2001, DCSS wrote to Irwin to inquire about why his employer was not garnishing funds from his paycheck for child support. Irwin responded by explaining that he was the majority shareholder of his employer, and his salary was so low that the maximum allowable wage garnishment would not cover his support obligation. He indicated that he could and would pay more from his own funds than could be obtained by garnishing his paycheck. By the end of 2001, although Irwin had started paying down his arrears, he still had a remaining unpaid balance of $14,184.21, including interest.[3]

On December 28, 2001, PRSI was sold to, and merged with, a company called US Search Screening Services, Inc. (USSI). As the majority shareholder of PRSI, Irwin received compensation for the sale of his stock in the form of stock in USSI, as well as a significant sum of cash to be paid over time. Under Securities and Exchange Commission (SEC) rules, the stock that Irwin received in the transaction was subject to stringent restrictions on transfer; he could not sell it at all for one year (i.e., until January 2003), and thereafter could only sell it in quantities determined by the volume of stock traded on the open market.

As part of the merger transaction, Irwin also entered into an employment contract with USSI under which he received a salary of $8,670 per month ($104,396 per year).[4] The terms of the merger transaction also included a covenant under which Irwin was prohibited from competing with USSI (or its successor) until after December 31, 2005, which was after Irwin's 64th birthday. He also paid $100,000 in legal fees in connection with the merger.

On January 15, 2002, Irwin received a lump sum payment of $204,000 as part of his consideration from the merger of PRSI and USSI. One week later, on January 22, 2002, Irwin met with Julie at the DCSS office and paid the

---

[3] It is unclear from the record whether the $10,000 arrears that Irwin owed as of November 1993 was paid off in whole or in part by June 1994. If it was, the arrears owed as of the end of 2001 represents, at most, about 19 months of missed payments during the 91-month period between June 1994 and the end of 2001, not taking interest into account. If some of the arrears Irwin owed as of 2001 dated back to 1993, the number of payments Irwin missed during the 1994 to 2001 period was presumably less than 19.

[4] In August 2002, Irwin's salary at USSI was increased to $194,396 per year.

entire amount of child support arrears that DCSS indicated he owed as of that date.[5] The next day, DCSS informed Irwin that Julie had requested that her child support collection case be closed.

Starting in February 2002, Irwin paid directly to Julie the $741 per month in child support that he owed under the order then in effect. Except for a deduction in February 2002 on account of Alexandra's uninsured dental or orthodontic expenses that month (a type of offset to which Julie had historically consented), he paid in full every month. In March 2002, DCSS filed a motion to modify the amount of support on the ground that Irwin's income had increased, but the motion was dropped from the calendar on April 11, 2002, after Irwin's counsel contacted DCSS.

On April 17, 2002, Julie asked DCSS to reopen its case, contending that she had received only partial payment of the child support due for February 2002, and none in April. DCSS promptly notified Irwin that it was reopening its case. On May 20, 2002, DCSS filed a second motion to modify child support (the modification motion), which ultimately led to the order at issue in the present appeal.[6] From the time DCSS reopened its case until over a year later, in July 2003, neither Julie nor Irwin reported to DCSS that Irwin was regularly making child support payments directly to Julie, and had been doing so since February 2002. As a result, by August 2002, DCSS's records reflected—incorrectly—that Irwin was $4,446.66 in arrears on his child support payments. Accordingly, on August 30, 2002, DCSS's automated procedures generated a notice to a federal government agency reflecting the amount due.

Irwin acknowledged at the hearing that, during 2002, DCSS regularly sent him statements regarding the child support amounts it believed he owed, and that he did not contact DCSS to inform it that its records were in error. For example, on October 15, 2002, DCSS notified Irwin that, according to its records, as of October 31, 2002, he would owe a total of $5,970.82 in accrued child support arrears and interest. In late October 2002, Irwin's counsel wrote to DCSS asking for the first time for an accounting of the child support arrears DCSS contended Irwin owed. Around the same time, the modification

---

[5] Julie maintained at trial, at least initially, that the amount Irwin paid in January 2002 was a compromise, and not the full amount of the arrears he owed as of that date. The trial court did not find that any arrears remained unpaid as of the end of January 2002.

[6] On September 30, 2002, Julie retained counsel to represent her in the proceedings, but DCSS remained a party throughout. Both Julie and DCSS have filed respondents' briefs on this appeal.

motion, which had originally been noticed for hearing on July 10, 2002, and later continued to November 1, 2002, was continued again, and set for a four-hour "long cause" hearing on February 7, 2003.

On November 16, 2002, Alexandra celebrated her bat mitzvah, at a cost to Irwin of some $15,000. After the bat mitzvah, Irwin continued to pay for Alexandra to attend further religious training in "teen school," as well as for her extracurricular activities in dance and cheerleading.

On November 18, 2002, as a consequence of DCSS's notice to the federal agency regarding Irwin's supposed child support arrears, DCSS received from the Internal Revenue Service the sum of $4,446, which had been intercepted from Irwin's income tax refund and sent to DCSS, rather than applied to Irwin's estimated tax payment as he had requested. DCSS forwarded the entire amount to Julie, believing that Irwin was in arrears in an amount in excess of the intercepted sum. Julie took no action to inform DCSS of its error in this regard, and retained the entire payment. Irwin received notice of the tax intercept on November 25, 2002, and promptly forwarded it to his counsel. On December 24, 2002, and then again on January 28, 2003, DCSS provided Irwin and Julie's counsel with spreadsheets detailing its understanding of the status of Irwin's child support payments and the amount of his arrears.

On February 5, 2003, the parties stipulated to continue the hearing on the modification motion from February 7, 2003, to May 30, 2003. During this interval, on March 27, 2003, Irwin filed an order to show cause (the overpayment OSC), seeking a refund of the child support overpayment resulting from the tax refund intercept, as well as sanctions against Julie and DCSS. On May 27, 2003, by separate minute orders, the court continued both the hearing on the modification motion and the hearing on the overpayment OSC from May 30, 2003, to August 13, 2003.

By May 2003, DCSS's records showed—incorrectly—that Irwin had paid no child support since the beginning of 2003, and was in arrears by some $7,000. On July 14, 2003, however, Irwin's trial counsel met with DCSS and provided it with documentation of the child support payments that Irwin had made directly to Julie since February 2002. This was the first time DCSS had been made aware that Irwin had been paying child support directly to Julie on a regular basis during 2003. Once the documentation was provided, DCSS revised its position regarding Irwin's arrears under the existing child support order. By that time, however, the modification motion had been pending for over a year, and DCSS believed it was likely that Irwin's support obligation would be increased retroactively, generating a new arrears in an amount greater than the amount of the intercept. Accordingly, DCSS did not take any steps to refund the intercepted sum to Irwin.

Sometime in or around June of 2003, USSI was acquired by and merged into a new company called First Advantage Corporation (First Advantage). Irwin's shares of USSI were converted into shares of First Advantage, but his First Advantage shares remained subject to the same SEC restrictions on sale as his USSI shares. After the acquisition, Irwin continued to work for First Advantage at the same salary he had earned at USSI.

On August 13, 2003, the trial court began holding a consolidated hearing on both the modification motion and the overpayment OSC. The hearing was not completed, and a further hearing date was set for October 1, 2003. One of the issues in sharp dispute between the parties was the percentage of custody time to be attributed to Irwin for child support purposes. Julie had estimated that her share was as high as 99 percent, whereas Irwin contended that each party had custody of Alexandra 50 percent of the time. In support of his position, Irwin produced at the August 13, 2003 hearing a diary he had kept starting in March 2002, detailing the time he spent with Alexandra. He later testified that, during this period, he customarily picked his daughter up at school each weekday, helped her with her homework and gave her dinner, and delivered her to her mother's house around 9:00 p.m., except one or two nights a week when she slept at his house, and that she visited with him as much as she wanted on weekends and holidays.

The day after the hearing on August 13, 2003, Julie informed Irwin that he could no longer see Alexandra without her permission, and that he could no longer telephone Julie, thus effectively cutting off Irwin's access to his daughter. Due to Alexandra's protests, Julie modified her position somewhat, but she persisted in her refusal to allow Irwin any overnight visitation.

On October 1, 2003, the second session of the consolidated hearing on the modification motion and the overpayment OSC was held. By the end of that day, the hearing had lasted a total of eight hours. Julie's counsel estimated that she needed about three more hours, and Irwin's counsel estimated one hour, so the court set an additional four-hour hearing for December 12, 2003.

On October 8, 2003, Irwin filed an order to show cause regarding visitation (the visitation OSC), prompted by Julie's change of position regarding visitation in the wake of the first session of the hearing. During October 2003, Irwin and Julie attended a custody mediation with the trial court's family court services staff. They reached a tentative agreement, which Julie later calculated would have put her custody timeshare at 65 percent, but Irwin declined to sign it without talking to his counsel and Alexandra. According to Irwin, Alexandra was very unhappy with the mediated arrangement, and Irwin therefore declined to sign the agreement. On October 22, 2003, the hearing on the visitation OSC was continued to December 8, 2003; later, it

was continued to December 12, 2003, to be heard concurrently with the already-scheduled third session of the hearing on the modification motion and the overpayment OSC.

The third and fourth sessions of the hearing took place on December 12 and 24, 2003. On December 28, 2003, the day before his 62d birthday, Irwin retired, and in January 2004 he began receiving severance pay of $8,700 per month, to end in February 2005.

On January 13, 2004, Irwin and Julie participated in a second session of custody mediation. As a result, they agreed that a custody evaluation would be conducted, and that pending its completion, Irwin would have custody of Alexandra in the late afternoon on weekdays, and later into the evening on Wednesdays, plus alternate weekends. Irwin later testified that he agreed to this schedule only because he was anxious to ensure that he would be in a position to help Alexandra with her studies during her final exams, and that he did not anticipate that the schedule would continue on a long-term basis.

On January 16, 2004, Irwin sold 1,000 shares of his First Advantage stock for the sum of about $19,000. On January 20, 2004, he attempted to sell another 1,000 shares, but was only able to sell 202 at the $19.50 per share price that was the minimum he was prepared to accept. Meanwhile, on January 28, 2004, Irwin received the first installment of the remaining cash that was due to him in connection with the sale of PRSI, which was scheduled to be paid out at $64,600 per month for 12 months.

On January 21, 2004, the trial court held the fifth and final session of the hearing. After final briefing, the court took the matter under submission on February 9, 2004. The trial court's initial statement of decision (which the court later recharacterized as a tentative decision) was filed on March 17, 2004. The decision solicited comments from the parties on certain issues, particularly the question whether guideline support for 2004 would exceed Alexandra's reasonable needs and if so, whether the parties would agree that the excess would be deposited into an account designated for Alexandra's college education. The court scheduled a further hearing on May 12, 2004, to deal with these unresolved issues. On May 11, 2004, Irwin filed comments and objections regarding the tentative decision, in the form of a trial brief for the May 12, 2004 hearing.

At the hearing on May 12, 2004, the parties and the trial court discussed the court's proposal to establish a trust for Alexandra's benefit, into which Irwin could pay the amount of guideline child support for 2004 that exceeded Alexandra's needs. On June 16, 2004, the trial court filed an amended

statement of decision. Irwin filed further objections (styled, in the alternative, as a motion for reconsideration), and a hearing on those objections was held August 4, 2004.

The trial court's final order, filed August 20, 2004, increased Irwin's child support for the period from June 1, 2002, through December 31, 2002, to $3,884 per month, based on a finding that Irwin's average gross monthly income during 2002 was $54,175. For the period from January 1, 2003, through December 31, 2003, the order found that Irwin's average gross monthly income was $82,715, and accordingly set his child support at $6,347 per month. Subject to comment by the parties, and to any credits Irwin might establish by motion, the court tentatively found that Irwin's child support arrearage resulting from its order covering the period from June 1, 2002, through December 31, 2003, was $84,803.13.[7] Irwin was ordered to pay $2,500 per month towards these arrearages, starting September 1, 2004.

Effective January 1, 2004, the court found that Irwin's average gross monthly income for 2004 would be $143,415 per month, resulting in a guideline child support amount of $11,869 per month. The court found, however, that this amount of child support would be "unjust and/or inappropriate due to the special circumstances of this case since the calendar year 2004 income of [Irwin] represents a one[-]time anomaly . . . ." Based on this finding, the court ordered Irwin to pay "temporary" child support of $6,151 per month for 2004, and to pay the difference between the guideline support amount and the temporary support amount into a so-called *Chandler* trust (*In re Marriage of Chandler, supra,* 60 Cal.App.4th 124) to be established to pay for Alexandra's college education. Due to the uncertainty caused by the fact that the *Chandler* trust had not yet been established, and that the physical custody timeshare for 2004 might change after the completion of the custody evaluation, the court reserved jurisdiction to modify the amount of child support retroactively to January 1, 2004, and to make a final determination of any resulting arrearages. The court declined to make an order with regard to the amount of child support to be paid effective January 1, 2005.[8]

Regarding the tax intercept, the court awarded Irwin judgment against Julie in the amount of $4,456.66, plus interest, which it set off against the attorney fees it awarded to Julie. It also sanctioned both Julie and Irwin, each in the amount of $5,000, setting those amounts off against each other. However, the court declined to award Irwin further damages or to sanction DCSS.

---

[7] The court also found that as of July 30, 2004, Irwin's arrearages accrued under the prior child support order in effect through May 31, 2002, amounted to a total of $761.44.

[8] By the time the court's order was entered, Irwin had already filed a motion to modify his child support effective January 1, 2005.

## III.

## DISCUSSION

### A. Overview of Applicable Law When Reviewing Child Support Orders

In reviewing the trial court's order, we are mindful of California's strong public policy favoring adequate child support. (See, e.g., *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1454–1455 [89 Cal.Rptr.2d 874]; *Stewart v. Gomez* (1996) 47 Cal.App.4th 1748, 1754 [55 Cal.Rptr.2d 531].) That policy is expressed in statutes embodying the statewide uniform child support guideline. (See Fam. Code, §§ 4050–4076.[9]) " 'The guideline seeks to place the interests of children as the state's top priority.' (§ 4053, subd. (e).) In setting guideline support, the courts are required to adhere to certain principles, including these: 'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.' (§ 4053, subd. (a).) 'Each parent should pay for the support of the children according to his or her ability.' (§ 4053, subd. (d).) 'Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.' (§ 4053, subd. (f).)" (*Cheriton, supra,* 92 Cal.App.4th at p. 283.) "As an overarching concern, '[c]hild support orders must ensure that children actually receive fair, timely, and sufficient support reflecting the state's high standard of living and high costs of raising children compared to other states.' (§ 4053, subd. (*l*).)" (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 556 [14 Cal.Rptr.3d 482].)

A trial court's determination to grant or deny a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1150–1151 [62 Cal.Rptr.2d 466].) "We observe, however, that the trial court has 'a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . .' [Citation.] Furthermore, 'in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule . . . .' [Citation.] In short, the trial court's discretion is not so broad that it 'may ignore or contravene the purposes of the law regarding . . . child support. . . .' [Citation.]" (*Cheriton, supra,* 92 Cal.App.4th at pp. 282–283.) Moreover, to the extent that the trial court's decisions reflect an interpretation

---

[9] All further statutory references are to the Family Code unless otherwise noted.

of the statutory definition of income for child support purposes, this is a question of law that we review de novo. (See *In re Marriage of Scheppers* (2001) 86 Cal.App.4th 646, 649 [103 Cal.Rptr.2d 529]; *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150, 153–154 [90 Cal.Rptr.2d 159].)

## B. Treatment of Stock and Cash from Sale of Business as Income

In the proceedings below, Irwin urged the court to adopt the analysis of his gross monthly income that was presented by his executive compensation expert, Martin Wertleib. Wertleib's analysis included the cash from the sale of Irwin's interest in PRSI. Wertleib also assumed that the stock Irwin had received from the sale of PRSI (once it became available for sale under SEC rules), would produce a reasonable rate of return. He then added the assumed anticipated return on that investment to Irwin's salary (or, after his retirement, his severance pay) in order to determine his gross income. Based on this analysis, Wertleib opined that Irwin's average gross monthly income was $11,201 in 2002; $17,141 in 2003; and $11,305 in 2004.

The trial court rejected this analysis in its entirety. In computing Irwin's monthly gross income for the period from June 2002 onward, the trial court treated all of the proceeds that Irwin received from the sale of PRSI as income, including both the cash installments when received, and the market value of the stock as it became available for sale, regardless of whether it was actually sold. Accordingly, the court found that Irwin's average gross monthly income was $54,175 in 2002; $82,715 in 2003; and $143,415 in 2004.

 Irwin's primary contention on appeal is that the trial court erred in treating the proceeds from his sale of his equity interest in PRSI as income rather than capital gain. We note initially that, while the definition of income in section 4058 is broad, it is not limitless. (*In re Marriage of Scheppers, supra,* 86 Cal.App.4th at p. 649.) Generally, the types of income specified in the statute consist of money that the support obligor actually receives, and do not include unrealized increases in the value of assets. (*In re Marriage of Henry* (2005) 126 Cal.App.4th 111, 119 [23 Cal.Rptr.3d 707] ["If the Legislature had intended that the unrealized increase in the value of an asset should be considered income, it would have said so."].) This is consistent with "[t]he traditional understanding of 'income' [as] the gain or recurrent benefit that is derived from labor, business, or property [citation], or from any other investment of capital [citation]." (*In re Marriage of Scheppers, supra,* 86 Cal.App.4th at p. 650.) Put another way, "[s]upport payments usually are paid from present earnings, not liquidation of preexisting assets." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 670 [3 Cal.Rptr.3d 390, 74 P.3d 166]; cf. *In re Marriage of Scheppers, supra,* 86 Cal.App.4th at p. 651 [" 'Income is the key

factor in our system, not capital or net worth.' "]; *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1380 [74 Cal.Rptr.2d 636] ["Only investment income, not investment principal, should be available to pay spousal support . . . ."].)

Thus, for example, an increase in the equity value of a support obligor's primary residence has been held not to constitute income for support purposes. (*In re Marriage of Henry, supra*, 126 Cal.App.4th at pp. 118–120; see also *In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 635–636 [120 Cal.Rptr. 654] [abuse of discretion to reduce spousal support based on value of supported spouse's accumulated equity in principal residence].) The principal amount of life insurance benefits received as a gift upon the death of the insured also is not income for child support purposes. (*In re Marriage of Scheppers, supra*, 86 Cal.App.4th at p. 651.) Similarly, the principal amount of a gift, inheritance, or lump sum personal injury award need not be treated as income for child support purposes, at least where, as here, the child is not receiving public assistance. (*County of Kern v. Castle, supra*, 75 Cal.App.4th at pp. 1451, 1453–1454 [where support obligor's actual income was sufficient to cover minimum basic needs of child, trial court did not err in declining to consider entire lump sum inherited by support obligor as income]; *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 529 [70 Cal.Rptr.2d 488] [inter vivos gift not income for support purposes]; *In re Marriage of Heiner* (2006) 136 Cal.App.4th 1514, 1521–1527 [39 Cal.Rptr.3d 730] [affirming trial court order declining to include entirety, or allocated portion, of lump sum personal injury settlement in child support obligor's income]; cf. *County of Contra Costa v. Lemon* (1988) 205 Cal.App.3d 683, 688–689 [252 Cal.Rptr. 455] [where supported child was benefiting from public assistance, lottery winnings that were income for public assistance eligibility purposes should also have been considered income for child support purposes].)

This is not to say that a child support obligor's assets are entirely irrelevant to determining his or her income for support purposes. For example, where the supporting party has chosen to invest his or her funds in non-income-producing assets, the trial court has discretion to impute income to those assets based on an assumed reasonable rate of return.[10] (*In re*

---

[10] And, of course, a supporting party's possession of assets may result in the attribution of income to that party for child support purposes to the extent that the party *actually realizes* income stemming from those assets, such as through dividends, or if the party's use of an asset results in decreased living expenses (for example, by moving into an inherited mortgage-free home). (See *County of Kern v. Castle, supra*, 75 Cal.App.4th at pp. 1451, 1453–1454.) Moreover, we do not disagree that where a support obligor possesses considerable wealth, the court should "consider imputing reasonable income on [the obligor's] assets, . . . to the extent necessary to meet the children's reasonable needs. [Citation.]" (*Cheriton, supra*, 92 Cal.App.4th at p. 292.) We do not, however, read *Cheriton* as broadly as Julie would have us do, that is, as authorizing trial courts to treat not just an imputed income stream, but the *entire principal value*

*Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1363 [119 Cal.Rptr.2d 430]; *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1390, 1393–1397 [111 Cal.Rptr.2d 487]; *In re Marriage of Dacumos, supra,* 76 Cal.App.4th at pp. 153–155.) This is essentially the approach that Irwin's expert, Wertleib, took in his analysis, and that Irwin urged the court to adopt in determining his gross income.

In rejecting Irwin's position, the trial court explained its decision to treat the unrealized gain inherent in Irwin's stock as income by analogizing his shares to stock options, which have been held to constitute income for support purposes where they represent an element of a supporting party's compensation package for past, present, or anticipated future services. (See, e.g., *Cheriton, supra,* 92 Cal.App.4th at pp. 285–289; *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 95–96 [91 Cal.Rptr.2d 374].) In our view, this reflects a fundamental misunderstanding of the difference between compensatory stock options and shares of stock acquired as part of the proceeds from the sale of an employee's equity interest in a business.

Unlike actual shares of stock, stock options do not represent an ownership interest in the underlying business, but are merely a contractual right to purchase stock at a set price (the "strike price"). This right to purchase stock is usually subject to conditions, such as limitations on when the options may be exercised, and a requirement that the option holder continue employment with the issuing company. The value of unexercised stock options is inherently speculative, because it lies in the potential that a difference may arise, by the time the options are exercised, between the strike price and the market price. If the market price climbs higher than the strike price, the holder of the options will be able to realize income, in the form of the difference between the two prices, if he or she purchases the underlying stock and then immediately sells it. Only if the option holder chooses to purchase the stock at the strike price, but does not sell it, will he or she have acquired an equity interest in the underlying business. In order to do that, however, the option holder must invest funds in the amount of the strike price times the number of shares purchased. (See generally *Scully v. US WATS, Inc.* (2001) 238 F.3d 497, 507–508 [explaining nature of executive stock options generally]; Karns & Hunt, *Should Unexercised Stock Options Be Considered "Gross Income" Under State Law for Purposes of Calculating Monthly Child Support Payments?* (2000) 33 Creighton L.Rev. 235, 253.)

As already noted, stock options are often given to corporate executives and higher-level employees as part of their incentive compensation packages. (See

---

of a support obligor's assets, *including any unrealized gain* attributable thereto, as income for child support purposes. In any event, Irwin's wealth does not approach the magnitude possessed by the support obligor in *Cheriton.*

generally *In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 784–787 [201 Cal.Rptr. 676]; Note, *Acting in the Best Interests of the Child: A Solution to the Problem of Characterizing Stock Options as Income* (2001) 69 Fordham L.Rev. 1523, 1534–1535.) By contrast, the USSI stock that Irwin received in the merger was not given to him as compensation for his past, present, or future services. Rather, it was part of the consideration for his sale of an existing capital asset, i.e., his stock in PRSI. In this regard, the unliquidated stock received for equity, rather than as compensation, is indistinguishable from other types of acquired nonliquid assets that are not normally considered income for support purposes. (*In re Marriage of Kuppinger, supra,* 48 Cal.App.3d at pp. 635–636; *In re Marriage of Scheppers, supra,* 86 Cal.App.4th at p. 651; *In re Marriage of Schulze, supra,* 60 Cal.App.4th at p. 529.)[11]

While Irwin continued employment with USSI, his compensation for services took the form of a generous salary, which was properly included in the court's calculation of his gross income.[12] The fact that Irwin's USSI stock only became available for sale over time was not the result of a contractual condition designed to retain Irwin as a USSI employee, as would typically be the case with stock options, but rather because of SEC rules that were beyond the control of either party.

For all of the foregoing reasons, we conclude that the market value of unsold shares of stock received by a business owner in connection with the sale of a business generally is not income for child support purposes.[13] Accordingly, to the extent that Irwin did not actually realize gain from the stock he received as a result of the sale of PRSI, the trial court erred in treating the market value of his shares as income as soon as they became available for possible sale. Moreover, to the extent that Irwin sold the shares only for the purpose of reinvesting them in income-producing assets, the resulting gain also was not income, but merely the replacement of one capital

---

[11] The same distinction we draw here was also made in *Cheriton, supra,* 92 Cal.App.4th 269. In that case, the court stated that because the child support obligor had "earned the stock options as part of his compensation package," the entire proceeds from his sale of the underlying stock "constitute[d] income to him. By contrast, in exercising her options and then selling her stock, [the child support recipient] was *liquidating a principal asset* that she received in the property settlement. [Citation.]" (*Id.* at p. 289, fn. 10, italics added.) Therefore, the court concluded that the support recipient's stock sale "st[ood] on a different footing from" the support obligor's. (*Ibid.*)

[12] Actually, Irwin's compensation package at USSI also included stock options, but they proved to be valueless due to the decline in the value of USSI's stock, and thus were not a factor in the trial court's support calculations.

[13] Our holding is not intended to immunize from treatment as income assets that have been acquired through transactions deliberately structured to avoid or to minimize support obliga-tions. In this case, as Julie's counsel acknowledged at oral argument, there is no evidence that the terms of the sale of PRSI were designed to avoid Irwin's obligations to Alexandra.

investment with another. (Cf. *In re Marriage of Kuppinger, supra,* 48 Cal.App.3d at pp. 634–635 [rejecting argument that income should be imputed to supported spouse based on asserted obligation to invest in income-producing assets, where funds derived from sale of one non-income-producing asset had been reinvested in another].)

On the other hand, to the extent Irwin sold the shares and spent the proceeds, as opposed to reinvesting them, the trial court had discretion to treat the realized gain as income. Additionally, in the court's discretion, a reasonable rate of investment return could be imputed to the value of the stock that was available for sale, and that amount added to Irwin's gross income, as suggested by his expert witness, Wertleib.

██ This brings us to Irwin's contention that the trial court erred not only in treating the value of his stock as income, but also in treating the cash he received from the PRSI sale as income. We agree with Irwin that the cash he received from the sale was also a capital asset, because it was the proceeds from the liquidation of a capital asset.[14] Nonetheless, there is a distinction between the cash and the stock, in that the cash represents *realized* rather than unrealized capital gain. With respect to the treatment of *realized* capital gain as income, the governing principles are somewhat different. To the extent that a support obligor has spent funds derived by liquidating his or her capital, rather than reinvesting them, the trial court acts within its discretion in considering the funds expended to be income for support purposes. (See *In re Marriage of de Guigne, supra,* 97 Cal.App.4th at pp. 1362–1366.) This may even be true where the funds generated by liquidating capital have been used to pay accumulated debts rather than current expenses. (See *In re Marriage of Kirk* (1990) 217 Cal.App.3d 597, 607–608 [266 Cal.Rptr. 76].)

There is some evidence in the record that Irwin spent at least a portion of the cash he received from the sale of USSI to pay past debts and for other purposes. The trial court would have acted within its discretion in treating that portion of the cash as income. Unfortunately, however, that was not the basis of the trial court's ruling; the court held that *all* of the cash constituted income, although Irwin had not spent it all.[15] Under the circumstances,

---

[14] In finding that this cash constituted income, the trial court relied extensively on the fact that it was paid out over time. This may have been a function of limitations on USSI's cash flow, or of tax considerations, or some other extrinsic factor. It cannot change the fundamental economic character of the money Irwin received in exchange for the sale of his PRSI stock.

[15] On the contrary, the court found that Irwin's income as analyzed by Wertleib (i.e., his salary or severance pay plus an imputed income stream from his stock and cash) was sufficient (albeit barely) to cover his reported expenses in 2003, and fell short of doing so in 2004 only by "several thousand dollars." This finding is supported by substantial evidence, and neither

therefore, it was an abuse of discretion for the trial court to treat all of the cash realized from the sale of Irwin's principal capital asset—his stock in PRSI—as income.

On remand, the trial court may, in its discretion, make additional findings (and, if necessary, take evidence) regarding how much of the proceeds from the sale of PRSI (whether in the form of cash, or the proceeds of sales of USSI or First Advantage stock) Irwin spent during the relevant period, as opposed to reinvesting it. To the extent he did so, the trial court may, in its discretion, treat the funds so expended as current income for the purposes of calculating child support. Otherwise, both the stock and the cash must be treated as capital assets, and the court's discretion is limited to imputing an income stream to those assets for support purposes.

**C.–F.**\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

## DISPOSITION

The trial court's order is reversed in part, and this matter is remanded to the trial court for further proceedings consistent with this opinion. Specifically, the trial court shall redetermine Irwin's income for child support purposes for the period from June 1, 2002 through December 31, 2004, in accordance with the principles expressed *ante*, and shall recompute the resulting guideline child support amounts for each year, and resulting arrears, based on the revised figures for Irwin's income. If the court determines that the recomputed guideline child support for the calendar year 2004 exceeds the child's reasonable needs, the court may, in its discretion, reduce the amount of support to be paid, provided the parties agree on the terms of a trust into which Irwin is to pay the excess for the benefit of the child's future

Irwin nor respondents argue otherwise on appeal. (See *In re Marriage of Schulze*, *supra*, 60 Cal.App.4th at p. 529 [substantial evidence standard applied to review of trial court's factual findings].)

\*See footnote, *ante*, page 1361.

educational and other needs. The trial court shall also reconsider the sanctions awarded against Irwin in light of our opinion, and may eliminate, reduce, or reaffirm the award in the exercise of its discretion.

Kline, P. J., and Haerle, J., concurred.