Filed 10/3/16  Marriage of Csupo CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| In re the Marriage of GABOR and BRET CSUPO. | B263058<br><br>(Los Angeles County<br>Super. Ct. No. BD489643) |
| GABOR CSUPO,<br><br>      Respondent,<br><br>      v.<br><br>BRET CSUPO,<br><br>      Appellant. |  |

APPEAL from orders of the Superior Court of Los Angeles County. Robert E. Willett, Judge.  Affirmed.

Stephen Temko and Dennis Temko for Appellant.

Young, Spiegel & Lee, Lance S. Spiegel and Hyunu Lee for Respondent.

_____

Bret Crain (formerly Bret Csupo) appeals from postdissolution orders that interpreted an agreement for spousal and child support. She seeks arrears in support payments that she claims are due because her ex-husband, Gabor Csupo, did not include capital gains he received from the sale of real property as "income" for purposes of calculating the agreed-upon support payments. After properly considering extrinsic evidence concerning the meaning of the parties' agreement, the trial court found that the parties did not intend to include the proceeds of real estate sales as "income" for purposes of child and spousal support. The trial court's conclusion is supported by substantial evidence, and we therefore affirm.

## BACKGROUND

Bret and Gabor married in 1999 and separated in 2008.[1] They have three children, who were all minors at the time the marriage was dissolved in September 2010.

The parties executed a marital settlement agreement (MSA) on August 6, 2010, following a mediation. The MSA was incorporated into a judgment of dissolution filed September 16, 2010. The MSA specified the division of marital property, including real property, and established procedures for calculating spousal support and child support. Both the spousal support and the child support provisions set a base monthly amount of support payments subject to increase if Gabor's monthly "income" exceeded a threshold amount ($54,050) over the prior quarter.[2] The base amount of monthly child support was $9,216 and the base amount of monthly spousal support was $12,789. Under the terms of the MSA, the spousal support obligation expired in November 2011.

---

[1] Because the parties formerly shared their last name, for the sake of clarity we refer to them by their first names in this opinion.

[2] Gabor characterizes this mechanism as an "Ostler-Smith" provision. The term refers to *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, in which the court ordered support based on a fixed amount plus a percentage of the husband's bonus. Bret objected below to characterizing the support calculation mechanisms in the MSA as "Ostler-Smith" provisions on the ground that the MSA does not use that term. We therefore refer to the support calculation mechanisms as the "Excess Income Provisions."

2

Prior to the dissolution, Gabor made a good living as a writer, producer and director and as a co-owner of an animation business. According to Gabor, his fortunes began to decline in 2003 when he and his business partner lost a contract with Nickelodeon, but he continued to obtain some directing jobs and received residuals from past projects. At the time the MSA was executed, the primary source of his income was from residuals.

Gabor testified that the purpose of the Excess Income Provisions in the MSA was to calculate increased support payments in the event that he obtained additional employment income, such as from directing jobs or from extra residuals. He also testified that he had a real estate portfolio for investment purposes. However, the record did not show any capital gains realized during the marriage.

The MSA attached a "DissoMaster"[3] printout as an exhibit, which provided a breakdown of the inputs used to calculate Gabor's monthly support payments. The only income listed in the DissoMaster summary was from "Wages + salary." It is undisputed that the DissoMaster calculation did not include any amounts from capital gains.

One of the items of real property assigned to Gabor in the MSA was a building on Highland Avenue in Los Angeles. Gabor sold that building in January 2011 for a substantial profit. He used proceeds from that sale to acquire and improve another property on Louise Avenue in Encino. He sold the Louise property in 2012 and also realized gains on that sale.

On December 23, 2013, Bret filed a request for modification of child support. On March 4, 2014, she filed a request for an order awarding alleged arrearages for both spousal and child support. Bret sought alleged arrearages of $223,452 for child support

---

[3] "The DissoMaster is a privately developed computer program used to calculate guideline child support under the algebraic formula required by [Family Code] section 4055." (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1227, fn. 5.) Subsequent undesignated statutory references are to the Family Code.

and $355,561 for spousal support. The claims were largely based upon alleged capital gains from Gabor's sales of the Highland and Louise properties.[4]

The trial court combined Bret's two requests for trial, which occurred on August 25 and August 29, 2014, followed by argument and further briefing. The court provided oral tentative findings at a hearing on September 5, 2014, followed by a written tentative ruling on September 30, 2014. Based upon the extrinsic evidence and examination of the MSA as a whole, the trial court concluded that the parties "did not intend to include capital gains within the meaning of income" even though it was not in the best interests of the children to exclude such money.

The court issued a final order on February 2, 2015. The court found that, except for amounts attributable to the fourth quarter of 2013 (amounting to $14,749, which Gabor had already paid), Bret "has failed to carry her burden of proving that there are support arrearages due from [Gabor]." However, the court modified Gabor's child support obligation. The modification reduced Gabor's monthly child support base payment, but included an *Ostler-Smith* excess income adjustment that is based on Gabor's "total annual income from all sources." In calculating Gabor's income for purposes of the new support payment, the trial court included an amount equivalent to an assumed rate of return on Gabor's realized capital gains from the sale of the Highland and Louise properties.

Bret filed her notice of appeal on March 30, 2015.

**DISCUSSION**

1. **The Trial Court's Interpretation of the Parties' Marital Settlement Agreement Was Supported by Substantial Evidence**

Bret's principal argument on appeal is that the trial court erred in interpreting the term "income" in the MSA's Excess Income Provisions. She first argues that the term was clear on its face and the trial court therefore erroneously considered extrinsic

---

[4] On appeal, Bret claims that the arrearages total $155,671 for child support and $254,303 for spousal support.

4

evidence of its meaning. Alternatively, she claims that, even if the court properly considered such evidence, it erred in concluding that the intent of the parties was to limit "income" in the Excess Income Provisions only to income from Gabor's earnings and not to include capital gains from the sale of the Highland and Louise real properties. We reject both arguments.

The rules governing the interpretation of written agreements are well established. A contract "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) If possible, intent should be determined from the language of the agreement. However, if a contract is ambiguous on its face, or if parol evidence shows that it is reasonably susceptible to two or more interpretations, extrinsic evidence may be considered. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521 (*Bill Signs Trucking*).) Extrinsic evidence is admissible if it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage Co.* (1968) 69 Cal.2d 33, 37.) Marital settlement agreements that are incorporated into a dissolution judgment " 'are construed using the same statutory rules governing the interpretation of contracts generally.' " (*In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1518; *In re Marriage of Trearse* (1987) 195 Cal.App.3d 1189, 1192 (*Marriage of Trearse*).)

The trial court's threshold finding of ambiguity is a question of law that is subject to independent review on appeal. (*Bill Signs Trucking, supra*, 157 Cal.App.4th at p. 1521.) If the extrinsic evidence is not in conflict, the trial court's interpretation of the contract is also subject to independent review. (*Ibid.*) However, if the extrinsic evidence conflicts, we must uphold any reasonable construction that is supported by substantial evidence. (*Ibid.*; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746–747.) In reviewing for substantial evidence, we must resolve all conflicts in the evidence in favor of Gabor as the prevailing party and make all legitimate and reasonable inferences from the evidence to uphold the trial court's findings if possible. (*In re Marriage of Bonds*

5

(2000) 24 Cal.4th 1, 31, superseded by statute on another point, as stated in *In re Marriage of Cadwell-Faso & Faso* (2011) 191 Cal.App. 4th 945, 958.)

### a. The term "income" in the MSA's Excess Income Provisions is ambiguous

The MSA does not define "income." In the abstract, the term could include any number of monetary sources, including salary, business earnings, and profits from sales. In the absence of a precise definition, the scope of the term is unclear.

Consideration of the MSA as a whole does not settle the question. While the term "income" could be interpreted broadly, the operation of the Excess Income Provisions suggests a definition that does not include the proceeds of real property sales. The provisions established a calculation that mandated increased support payments if Gabor's income exceeded a certain amount *per month*.[5] The use of a monthly income amount to calculate increased payments seems more consistent with an intent to address fluctuations in monthly earnings than with a desire to capture gains from one-time sales of real property. In addition, the monthly base amount that the Excess Income Provisions established for child support payments was computed using DissoMaster inputs that included only "wages and salary," not income from other sources.

In light of the various possible meanings, the trial court was not limited to interpreting the MSA from the four corners of the agreement. As discussed above, "[i]n California a party is entitled to introduce extrinsic evidence in support of his interpretation of language in an agreement embodied in a writing, provided the evidence is offered to support a meaning to which the language is reasonably susceptible." (*Marriage of Trearse*, *supra*, 195 Cal.App.3d at p. 1192.)

Gabor testified that the intent of the Excess Income Provisions was to capture extra income from his sporadic employment and residuals from past work. The evidence showed that his earnings varied due to the nature of his work in the entertainment

---

[5] Although the provision for excess child support omitted the term "per month," Bret stipulated that was a mistake by the mediator.

industry. Gabor's expert also testified that such provisions are typically used to account for variations in employment earnings. This evidence supported the possible interpretation of income in the Excess Income Provisions as income from earnings rather than capital gains. The language of the MSA was susceptible to that interpretation.

Other evidence also supported a reasonable interpretation of "income" as earnings. The MSA divided the marital property—including real property—and specified each party's separate interest. The MSA assigned the Highland property to Gabor. Bret also received separate interests in various real property, including 50 percent of a property in Hawaii and a portion of the proceeds of the sale of the family's former residence. The evidence showed that Bret in fact received proceeds from the sale of several properties after the MSA was signed, including a 40 percent interest in the proceeds from the sale of the former residence, which she used to help support herself and her children over five years. On the whole, the evidence was consistent with an agreement for the division of property in the MSA that allowed the parties to exclude the value of that property from support calculations.

Arguments that Bret made below also indirectly support this interpretation. In the trial court, Bret argued that capital gains were not included in the DissoMaster calculation attached to the MSA because "at the time of the MSA, any capital gains by the parties would have been viewed as a community asset and divided. It wouldn't have been viewed as income attributed to [Gabor] for income available for support. So there would not have been a reason for capital gains to be included in the DissoMaster." If the proceeds from the sale of real property divided under the MSA would not have been included in assessing the parties' respective income for purposes of calculating support prior to the dissolution, it is reasonable to conclude that the parties did not intend to include such property in a support calculation after the dissolution.

Bret argues that the term "income" in the MSA was unambiguous because the law is clear that income can include capital gains for purposes of calculating child support payments. Bret cites section 4058 along with various cases interpreting that statute,

which she characterizes as creating a "right" to use capital gains for the calculation of child support. The argument is unpersuasive for several reasons.

First, it assumes that the parties intended to import the *legal* meaning of "income" from child support cases into the Excess Income Provisions. The undefined term "income" in the Excess Income Provisions is certainly susceptible to that interpretation, depending upon other evidence of intent. But it is by no means certain.

Several general propositions bear upon this assumption. " 'The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.' " (*Biancalana v. Fleming* (1996) 45 Cal.App.4th 698, 702, citing Civ. Code, § 1644.) Bret cites *Estate of Heard* (1957) 49 Cal.2d 514 for the principle that courts should assume that the drafters of a written instrument did not intend to "pursue a course contrary" to law. (*Id.* at p. 522.) *Heard* also instructs that "words in a private instrument should ordinarily, in the absence of a showing of a contrary intent, be given the effect given them by the statutory or case law." (*Id.* at p. 521.) However, the case that *Heard* cites for that proposition, *Weinreich E. Co. v. A.J. Johnston Co.* (1915) 28 Cal.App. 144, states more specifically that "*legal* terms are to be given their legal meaning unless obviously used in a different sense." (*Id.* at p. 146, italics added.)

None of these principles dictates an interpretation here. The MSA does not indicate whether the parties intended to use the common term "income" in a particular legal sense. There is also no reason to believe that the parties perceived a need to include capital gains in the definition of income because the law required them to do so. Moreover, as discussed above, the operation of the Excess Income Provisions suggests that the parties did not intend to include nonrecurring capital gains events.

Second, the legal authorities that Bret cites in support of her definition of income concern the financial resources to be considered for calculating *child* support payments. Spousal support is governed by sections 4300–4360, not section 4058. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302 (*Cheriton*).) Courts have broad discretion in

8

determining spousal support in light of the factors identified in section 4320. (*Cheriton*, at pp. 302–304.) The statutes governing spousal support do not contain any definition of income.

Bret and Gabor used the same excess income mechanisms to calculate child support and spousal support, albeit applying different percentages, using the same undefined term "income." There is no indication that they intended that term to be interpreted differently in the two provisions. Bret's argument that the court should presume that the parties drafted the Excess Income Provisions to incorporate the applicable law has even less force when it is not clear what law would govern.

Third, Bret's claim that she did not waive her "right" to include Gabor's capital gains in the child support calculation is based on a faulty premise. There is no "right" to receive a portion of capital gains as child support. If there had been no agreement, the court would have had the discretion to include Gabor's realized capital gains in a child support calculation, but it was not required to do so. *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361 (*Pearlstein*), the primary case on which Bret relies, refers repeatedly to the trial court's "discretion" to include the proceeds from stock sales in a child support calculation if those proceeds were not reinvested in other income producing assets. (See *id.* at pp. 1376–1377.) It did not hold that the trial court had an obligation to do so.[6] The statutory child support scheme does not create an enforceable "right" to a portion of capital gains that must be expressly waived.

Bret also argues that Gabor conceded in the trial court that capital gains were "income" when he stipulated that "capital gains is income within the meaning of Family Code section 4058." But this stipulation was, at most, simply a legal admission

---

[6] Even amounts included in the statutory guidelines for the calculation of child support under section 4055 are not mandatory. Courts can use their discretion to depart from those guidelines under the circumstances identified in section 4057, which include the parties' stipulation to a different amount, subject to section 4065, subdivision (a). In any event, Bret does not argue that including capital gains from Gabor's real property sales in the child support calculation was necessary to comply with the guideline formula in section 4055.

9

concerning the scope of section 4058. Contrary to Bret's contention, it did not include any factual concession about the intent of the parties in using the term "income" in the Excess Income Provisions.

Thus, the term "income" in the Excess Income Provisions was ambiguous, and the trial court correctly considered extrinsic evidence to interpret its meaning.

**b.      The trial court's interpretation was reasonable in light of the extrinsic evidence and the language of the agreement**

The trial court weighed conflicting evidence about the meaning of the Excess Income Provisions. Gabor testified that the provision was intended to include only earnings; Bret testified that it was not so limited. An important part of Bret's argument below was that the parties expected that real estate sales would be included in the excess income calculation because of Gabor's history of real estate dealings during the marriage. The court rejected that argument based on the evidence, concluding that "[i]f there were capital gains realized during the marriage, they were not identified in any way that is persuasive to the court and they were not within several years before the MSA was executed."[7] Because the trial court reached its decision based upon disputed extrinsic evidence, we employ the substantial evidence standard to review its interpretation of the MSA. (*Bill Signs Trucking*, *supra*, 157 Cal.App.4th at p. 1521; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

Substantial evidence supported the trial court's interpretation. The court concluded that, if the parties had intended to include capital gains within the meaning of income, they would have made some provision for treatment of those amounts in the MSA. The court also concluded that "the requirement for quarterly payments on account

---

[7] The trial court explained this conclusion orally on September 5, 2014, before permitting further briefing and offering a written tentative ruling on September 30. Because no statement of decision was requested, there is no record of the final and complete factual findings underlying the court's final order on February 2, 2015. In the absence of such a statement of decision, "all intendments will favor the trial court's ruling and it will be presumed on appeal that the trial court found all facts necessary to support the judgment." (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 648–649.)

of 'excess' income is more consistent with wage and salary income" than with capital gains income.  Both conclusions were reasonable based upon the evidence.

The court's conclusion that the quarterly payment scheme in the Excess Income Provisions was more consistent with wage and salary income than with real estate sales is supported by the testimony of Gabor's expert that the provisions are typical of "*Ostler-Smith*" mechanisms often used by entertainment executives whose income fluctuates depending upon the availability and success of projects.  The evidence showed that Gabor's income from work and residuals was subject to such fluctuation.

The trial court also reasonably concluded that, if the parties had intended to treat proceeds of real estate sales as income, they would have included some explanation of how such income should be assessed.  As discussed above (and as the trial court recognized), *Pearlstein* and the cases that it cites hold that capital gains that are reinvested in other income producing assets are not appropriately included in child support calculations.  (See *Pearlstein*, *supra*, 137 Cal.App.4th at pp. 1375–1377.)  Moreover, as the trial court also correctly recognized, income from capital gains is taxed differently from earnings, which would affect the calculation of the posttax income available for child support.  If the parties had intended to calculate child support based upon future real estate sales, one would expect them to have addressed such complexities in the agreement.[8]

The absence of any mention of future real estate sales in the Excess Income Provisions is even more telling in view of the detailed apportionment in the MSA of Bret and Gabor's separate interests in their real property.  In particular, the MSA expressly

_____

[8] As an example of such a specific agreement, the parties in *Kohn v. Kohn* (1950) 95 Cal.App.2d 708 expressly agreed that "income" for purposes of a marital settlement entitling the wife to a portion of the husband's yearly income should be calculated " 'without the addition or inclusion of capital gains and profits, unless such capital gains and profits be reduced to cash or other liquid form, in which latter event, any profit realized by capital sales or conversions, or otherwise, shall constitute income.' " (*Id.* at p. 711.)

identified the Highland property as Gabor's separate property, but did not include any explanation of how to calculate "income" in the event it was sold.

Testimony supported the conclusion that the parties would likely have addressed the real property interests divided in the MSA if they had intended to include the proceeds from sales of that property in the excess income calculation. On cross-examination by Bret's counsel, Gabor's expert testified that he did not include real property capital gains in his analysis of income available for support because "I don't believe the normal intent of people in writing excess income formulas is to include gains from the sale of assets, in this case, assets that were literally part of the marital settlement agreement that were sold shortly thereafter." From the evidence, the trial court could reasonably infer that the absence of any mention of real property proceeds or other capital gains in the Excess Income Provisions meant that the parties did not mean to include them.

The trial court also heard other evidence from which it could have assessed Bret's credibility negatively. For example, on cross-examination Bret admitted that she had not included the proceeds of the sale of her condominium in the "income" that she reported on her income and expense declaration dated the same day as the MSA (August 6, 2014). In considering another issue (i.e., the parties' testimony about the respective time that they spent with the children), the trial court noted Bret's "tendency to exaggerate" which "diminishes her credibility on this issue as it does on other issues."

There is abundant evidence to support the trial court's understanding of the parties' intent in using the term "income" in the Excess Income Provisions. We therefore affirm the trial court's interpretation.

## 2. Bret's Public Policy Argument Provides No Basis to Award Arrearages

Bret claims that, if capital gains are not included in "income" for purposes of the Excess Income Provisions, then the parties improperly "contracted away the children's right to child support" and the Excess Income Provisions were void as against public policy. We conclude that the Excess Income Provisions did not violate public policy, as

12

the parties expressly agreed that the child support obligation could be modified by the court.

The MSA provides that "[i]t is understood that the child support specified under this Section 4 is modifiable by a court of competent jurisdiction, if warranted by changed circumstances." Thus, the parties did not purport to bind the court to the agreed-upon child support obligation in the event the court concluded that it was not in the children's best interest in light of circumstances existing at the time.

In that critical respect the MSA is different from the agreements in the cases on which Bret relies. In *Cheriton*, the agreement that the court held unenforceable purported to limit the court in setting an appropriate child support amount. (See *Cheriton*, *supra*, 92 Cal.App.4th at p. 294.) The agreement stated that " 'the Court may not consider a monthly housing cost of over $3,000' " in calculating child support, regardless of the actual needs of the children. (*Ibid.*) In *In re Marriage of Ayo* (1987) 190 Cal.App.3d 442, the parties entered into a "hold-harmless" agreement that purported to relieve the father from his obligation to pay any child support that the court ordered. (*Ayo*, at p. 450.) The court concluded that the agreement was an invalid attempt "to completely obviate the clear and strong policy of this state that a parent must support his children." (*Ayo*, at p. 451.)

In contrast, the child support provision in the MSA left the court free to modify the child support award in the children's best interest. The trial court did in fact modify Gabor's child support obligation. In calculating the new child support payment, the court took capital gains into account. It specifically included an amount of income that it attributed to the return that Gabor could receive on the realized capital gains from his sale of the Highland and Louise properties after the MSA was executed. Bret does not challenge that modification on appeal.

Under section 4065, subdivision (a), parties are permitted to stipulate to a child support amount subject to court approval. The child support provision in the MSA provided a substantial fixed sum for child support ($9,216 per month) based upon historical income figures, included a mechanism for increasing that amount when

Gabor's income was higher than predicted, and permitted court modification if circumstances changed. We decline to hold that a child support stipulation with such provisions violates public policy.

**3.     Bret Acquiesced to the Trial Court's Order Concerning the Payment of Taxes on Residuals and Her Request to Modify that Order Is Therefore Waived**

Bret asks this Court to modify the trial court's order that Gabor pay taxes on all residuals he receives before remitting to Bret her share of those residuals pursuant to the MSA. However, it appears that the trial court ordered this procedure in response to Bret's request. At a minimum, she did not object to the order below and therefore cannot raise an objection on appeal.

The MSA stated that each party "shall pay their own taxes related to the receipt of residual income." However, a practice developed in which Gabor paid the taxes due on all residuals and then gave Bret her portion after deducting her share of the taxes. In a joint statement that the trial court ordered prior to issuing its final order, Bret requested an "order clarifying taxes on residuals." She stated that, "[i]f [Gabor] is indeed paying [Bret's] share of the taxes owed on her portion of the residuals and if the taxes are being attributed to [Bret] as nontaxable income in the attached dissomaster, then [Bret] seeks an order clarifying and confirming that [Gabor] shall pay taxes on all residuals whether paid to [Gabor] or [Bret]." Bret did not register any objection to Gabor paying the taxes and remitting to Bret her remaining nontaxable portion.

The court apparently interpreted Bret's statement as a request that Gabor pay all the taxes due for both parties' share of the residuals. In its final order, the court confirmed that, "pursuant to the terms of the parties' Marital Settlement Agreement," Gabor should pay the income taxes on all residuals and pay Bret "a net after tax sum for her share of the residuals." The court also ordered that Bret's "request for an order that [Gabor] shall pay taxes on all residuals whether paid to [Gabor] or [Bret] is denied."

On appeal, Bret claims that she asked the trial court to "clarify the MSA so [Gabor] would understand that he was not supposed to pay [Bret's] taxes." The actual language in the joint statement appears to request precisely the opposite. In any event,

14

Bret never objected to the trial court's order, and never tried to clarify the request on which the order was based, either in writing or at the hearing on November 18, 2014, more than two months before the final order, when the court orally announced its findings.  Bret cannot raise the issue for the first time on appeal.  (*Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 776.)

## DISPOSITION

The trial court's orders are affirmed.

NOT TO BE PUBLISHED

LUI, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.