Filed 3/12/14  Marriage of Bareket and Marcus CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of ITTAI HAIM BAREKET and STACY LYNN MARCUS. | |
| ITTAI HAIM BAREKET,<br><br>        Respondent,<br><br>v.<br><br>STACY LYNN MARCUS,<br><br>        Appellant. | A136067<br><br>(San Mateo County<br>Super. Ct. No. FAM0114605) |

### I. INTRODUCTION

Appellant Stacy Lynn Marcus (Marcus) challenges an order of the trial court regarding the child support obligations of Marcus's former husband, respondent Ittai Haim Bareket (Bareket), as well as a second order declining to reconsider the first order. Marcus[1] contends that the trial court erred by: (1) absolving Bareket of child support arrears accrued under a prior order; (2) improperly withholding child support on the basis of a prior agreement between the parties; (3) failing to make express findings justifying

---

[1] Appellate opinions in family law cases commonly refer to the parties by their first names, in order to avoid confusion when the parties share a surname.  (See, e.g., *In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 365, fn. 2.)  It is unnecessary, however, to follow this custom in cases in which the parties have different surnames. Accordingly, we refer to the parties by their surnames, as is common in appeals in which the parties are natural persons.  (See, e.g., *Krug v. Maschmeier* (2009) 172 Cal.App.4th 796, 798-799.)

1

the denial of Marcus's request for attorney fees; (4) calculating child support based on an incomplete and incorrect evaluation of Bareket's income; and (5) denying Marcus her right to offer evidence, and improperly denying her request for judicial notice. We vacate the trial court's first order in one respect, and remand for further proceedings as to that specific issue, but otherwise affirm both of the orders from which this appeal was taken.

## II. FACTS[2] AND PROCEDURAL BACKGROUND

Marcus and Bareket were married in 1992, and have one child, born in December 1997. Bareket petitioned for dissolution of the marriage in 2000, and subsequently obtained a status-only judgment of dissolution. Marcus and the child have resided in New York since 2001, and Marcus has had sole legal and physical custody of the child since July 30, 2005. A judgment resolving a number of issues regarding property division was entered in May 2004, and a judgment on other issues, including child support, was entered in November 2004. During the pendency of the dissolution proceedings, the parties have conducted extensive litigation, including postjudgment litigation over property division and child support issues, resulting in one published opinion by the Sixth District Court of Appeal (Sixth District)—*In re Marcus* (2006) 138 Cal.App.4th 1009—and three unpublished opinions.[3]

Bareket's dissolution petition was filed in the Santa Clara County Superior Court, and the ensuing litigation took place in that court, with appellate proceedings in the Sixth District, until September 27, 2010. On that date, the Santa Clara County Superior Court issued an order transferring the child support proceedings to San Mateo County Superior Court, based on Bareket's residence in that county.

---

[2] Both parties' briefs on appeal make factual assertions that are not supported with citations to the record, in violation of California Rules of Court, rule 8.204(a)(1)(C). We have disregarded all unsupported factual statements in both parties' briefs, and derived much of our statement of facts from our own review of the record.

[3] We take judicial notice, on our own motion, of the three unpublished opinions of the Sixth District in prior litigation between Bareket and Marcus. (Evid. Code, §§ 451, subd. (a), 452, subd. (d); Cal. Rules of Court, rule 8.1115(b)(1); see *Estate of Dito* (2011) 198 Cal.App.4th 791, 795, fn. 3.)

In June 2006, while the case was still before the Santa Clara County Superior Court, that court entered an order based on a stipulation by the parties (the June 2006 stipulation) resolving various pending issues relating to property division and child support. The parties intended the June 2006 stipulation to be "a complete resolution of all pending issues," and to "resolve any and all claims that either party may have against the other up to May 5, 2006," except those specifically reserved in a prior stipulated judgment, which included "child support in the future." The June 2006 stipulation expressly covered "[a]ll past due child support of whatever nature, including all claims for retroactivity of past due child support, add-ons, medical reimbursement claims or any other financial claims relating to the support of the minor child," and stated that Bareket was "current in his child support through April 30, 2006."

Under the June 2006 stipulation, Bareket agreed to pay Marcus $3,500 per month in child support "as a compromise of the disputed claims of the parties," with "no additional add-ons with the exception of health-care add-ons for deductibles and co-pays," and "one-half of any mandatory fees as a result of attendance of [*sic*] public school." The health care add-ons were to be "computed on an annual basis." The June 2006 stipulation provided that Bareket was "not responsible for private school for the child or college." The June 2006 stipulation further provided that in order for there to be "a sufficient change of circumstances to modify child support," Bareket's "yearly compensation from all sources" would have to exceed $600,000, and Marcus's "yearly compensation from all sources" would have to exceed $100,000.

The June 2006 stipulation also included a mechanism for adjusting child support annually for 2006 and succeeding years. It provided that starting in 2007, the parties would exchange specified information, by March 15 of each year, regarding their "total compensation from all sources" during the preceding year. If either party's income during the preceding year exceeded the modification thresholds ($600,000 for Bareket, $100,000 for Marcus), either party could request that the court modify the previous year's support retrospectively based on the parties' actual income for the previous year, and the

court would have "jurisdiction to retroactively modify the previous years [*sic*] support based on the information exchanged."

The June 2006 stipulation also contained a provision whereby Bareket waived an earlier award of attorney fees in the amount of $100,000, in his favor and against Marcus.

In January 2008, the Santa Clara County Superior Court denied Marcus's request to modify the child support amount set by the June 2006 stipulation, both retrospectively for 2006, and prospectively. Marcus appealed, and the Sixth District affirmed in an unpublished opinion. (*In re Marriage of Bareket and Marcus* (Nov. 12, 2009, H032760).) The Sixth District rejected Marcus's contention that the $3,500 monthly child support amount specified by the June 2006 stipulation should be increased because it was below the statutory guidelines, and declined to reach her argument that the provision for modification thresholds in the June 2006 stipulation was contrary to public policy. (*Ibid.* [pp. 6, 9–10].) It also held that the trial court did not abuse its discretion in declining to increase the child support owed by Bareket for the calendar year 2006. (*Ibid.* [pp. 7–8].)

On December 17, 2009, Marcus filed a request for modification of child support with the Santa Clara County Superior Court (the December 2009 motion), with a notice setting the matter for hearing on March 1, 2010. The December 2009 motion sought to modify the June 2006 stipulation, contending that the amount of child support set by that stipulation was below the guideline level; that there had been a change of circumstances in that Marcus had become unemployed; and that an upward deviation from the guidelines was warranted by Bareket's wealth. The December 2009 motion originally had an set of exhibits attached, which Marcus listed in her moving papers, and of which she requested the court to take judicial notice. The exhibits themselves are not attached to the copy of the motion that appears in our record, but some of the documents described on the exhibit list are included elsewhere in the clerk's transcript.

On September 1, 2010, Marcus obtained from the Santa Clara County Superior Court an order to show cause regarding child support add-ons that Marcus contended Bareket was obligated to pay under the terms of the June 2006 stipulation. The matter,

4

which we will refer to as the September 2010 motion, was set for hearing on September 15, 2010. In the September 2010 motion, Marcus sought payment of add-ons covering the years 2006 through 2010, including uninsured health care costs, school fees, and extra-curricular activities and lessons. Marcus did not attach any documentation supporting her requests, explaining that she was awaiting decisions and instructions from the court regarding the documentation needed. Marcus also explained that because the child's health insurance policies were in Bareket's name, she had not been able to obtain explanation of benefit statements showing what the insurance companies had and had not paid for the child's health care, but that Bareket had been sent such statements. Marcus requested that the court order Bareket to produce copies of all such statements he had received from 2006 through 2010.

On September 10, 2010, the Santa Clara County Superior Court filed three orders regarding the parties' child support issues. The first order rejected Marcus's contention that she had made a valid motion *prior* to December 17, 2009, to modify the child support provisions of the June 2006 stipulation. Accordingly, the court declined to modify the amounts due under the June 2006 stipulation for the calendar years 2006 through 2009 (subject to the retroactive review provided for by the June 2006 stipulation itself). However, the order acknowledged that the December 2009 motion had been properly filed, and thus that the child support terms set forth in the June 2006 stipulation could be modified with respect to time periods after December 17, 2009.

The second order filed on September 10, 2010, resolved the proceedings held to review the parties' income and modify the child support for the calendar year 2007. The court rejected Marcus's argument that events during 2007 that affected Bareket's equity interest in the privately held technology company of which he is the chief executive officer should result in the imputation of income to him, and therefore concluded the modification threshold in the June 2006 stipulation had not been met during 2007. The court also rejected Marcus's arguments that the unmodified support amount was below the statutory guidelines, and that the modification threshold provision was against public

5

policy. However, the court stated that Marcus could seek modification of the child support amount prospectively from the date of the December 2009 motion.

The third order filed on September 10, 2010, resolved outstanding discovery issues regarding Bareket's compensation for the calendar year 2007. The order also noted that the review of child support contemplated by the June 2006 stipulation was still pending for the calendar years 2008 and 2009, and that Marcus was still entitled to conduct discovery regarding Bareket's compensation during those years, and thereafter.

As already noted, on September 27, 2010, the Santa Clara County Superior Court issued an order transferring the child support proceedings to San Mateo County Superior Court, based on Bareket's residence in that county. At the time the proceedings were transferred, both the December 2009 motion to modify child support and the September 2010 motion for add-on expenses were still pending.

According to a summary provided by Marcus at the request of the San Mateo County Superior Court , the following matters were pending before that court as of March 12, 2012, and were set for hearing on May 1, 2012: (1) Marcus's December 2009 motion for prospective modification of child support, originally filed in the Santa Clara County Superior Court; (2) Marcus's September 2010 motion for child support add-ons; (3) the retrospective review of child support contemplated by the June 2006 stipulation, with regard to the years 2008 and 2009; and (4) an order to show cause regarding attorney fees, complex case designation, and venue.

At the hearing on May 1, 2012, Marcus and Bareket each appeared without counsel; Marcus participating by telephone. The court heard sworn testimony and argument from both parties. After the hearing, the court filed a written order (the May 2012 order) resolving the issues raised by Marcus's pending motions.

The May 2012 order granted Marcus's December 2009 motion for prospective modification of child support, and set that support at $4,110 per month for the calendar year 2010, and $3,625 per month from January 1, 2011 on, in accordance with computer calculations of guideline support, printouts of which were attached to the order. For the calendar years 2008 and 2009, however, the court found that the income thresholds

6

specified in the June 2006 stipulation had not been exceeded, and therefore declined to modify the support amount.

The May 2012 order required Bareket to pay half of the child's uninsured medical costs starting May 1, 2012, in accordance with procedures set out in an attachment to the order, but denied Marcus's September 2010 motion to the extent that it sought payment of non-medical add-on expenses such as private school tuition, which are discretionary rather than mandatory under Family Code section 4062, subdivision (b).[4]

Finally, the May 2012 order denied Marcus's requests for attorney fees, for a change of venue to New York, and for designation of the case as complex under section 2032, subdivision (b).

On May 16, 2012, Marcus moved to correct, set aside, or relieve Marcus from the May 2012 order (the motion to correct). Bareket filed a declaration opposing the motion to correct, and Marcus filed a reply declaration. The motion to correct was heard on July 24, 2012, with both parties present without counsel, and was denied in its entirety. On the same day, Marcus filed a notice of appeal.[5]

### III. DISCUSSION

### A. Denial of September 2010 Motion for Child Support Add-Ons

Marcus argues on appeal that the trial court erred in denying her September 2010 motion for child support add-ons—a ruling she characterizes as "forgiving the six (6) years of child support accrued under the 2006 child support order." This

---

[4] All further statutory references are to the Family Code unless otherwise specified.

[5] On May 31, 2013, Bareket filed a motion to dismiss Marcus's appeal under the doctrine of disentitlement. Marcus filed her opposition to the motion on July 3, 2013. On July 8, 2013, the motion was denied. We, therefore, disregard the argument made in Bareket's respondent's brief that this appeal should be dismissed under the same doctrine. We also decline to dismiss this appeal on the basis of irregularity in the service of the notice of appeal, as argued in Bareket's respondent's brief, inasmuch as it is not disputed that the notice of appeal was timely filed, and Bareket received actual notice of its filing no later than August 18, 2012. (See Cal. Rules of Court, rule 8.100(a)(3) ["Failure to serve the notice of appeal neither prevents its filing nor affects its validity . . . ."].)

mischaracterizes the May 2012 order. In fact, the trial court retroactively *increased* the basic monthly support Bareket had to pay for the years 2010 and 2011, and expressly ordered that Bareket pay the resulting arrears within 90 days.[6] In addition, the May 2012 order also affirmed Bareket's responsibility to pay health care add-ons from May 1, 2012 forward.

Thus, there were only two respects in which the trial court's May 2012 order could be characterized as having "forgiven" accrued child support. The first was that it declined to require Bareket to pay *discretionary* add-ons for the period between June 2006 and April 30, 2012. The trial court's reason for doing so is clear from its order. Under the terms of the June 2006 stipulation, Marcus waived the right to discretionary add-ons in general, with the exception of necessary fees for attendance at public school, and specifically waived the right to private school tuition. In exchange, Marcus received, among other consideration, Bareket's agreement to forego enforcement of an award of attorney fees as sanctions in the amount of $100,000, which was then pending on appeal. The effect of the May 2012 order, in regard to accrued *discretionary* child support add-ons, was simply to enforce that aspect of the parties' earlier agreement. We are not persuaded, in light of the overall record, that this was an abuse of discretion.

Marcus's argument as to the second respect in which the May 2012 order "forgave" accrued child support has merit, however. While the May 2012 order expressly confirmed Marcus's right to payment of health care add-ons from May 1, 2012 forward, and expressly denied Marcus's September 2010 motion for future add-ons "*except* as to medical related expenses" (italics added), the order did not explicitly address any mandatory health care add-ons that had accrued between the filing of the June 2006 stipulation and April 30, 2012, and remained unpaid as of May 1, 2012.

---

[6] It appears from the record that Bareket paid the basic child support required by the June 2006 stipulation on a monthly basis as it came due. Thus, when the trial court ordered in May 2012 that Bareket should have been required to pay a higher amount of monthly support during the years 2010 and 2011, this resulted in an amount of arrears equal to the difference between the amount Bareket actually paid and the amount the trial court held he should have paid.

Section 4063, subdivision (b), requires a parent who accrues or pays a child's uninsured health care costs to provide the other parent with an itemized statement of those costs within a reasonable time, not to exceed 30 days. As already noted, the June 2006 stipulation required an annual computation of health care add-ons. In Marcus's reply declaration filed in the San Mateo Superior Court on April 25, 2012, she identified and attached exhibits documenting both the expenses she incurred for the child's uninsured health care, and her prior attempts to collect reimbursement for those expenses, both informally and as part of her September 2010 motion.[7] The documents indicate that in seeking reimbursement from Bareket for his share of these expenses, Marcus did not comply fully either with the time limit specified in section 4063, subdivision (b), or with the requirement in the July 2006 stipulation for an annual computation of uninsured health care expenses.

Due to Marcus's failure to *timely* submit adequate documentation of what she had actually paid for the child's uninsured health care expenses, we cannot fault the trial court for not resolving Marcus's motion with respect to health care add-ons accrued between the filing of the June 2006 stipulation and April 30, 2012. Nonetheless, the trial court erred in this respect. Under section 4063, a parent's failure to provide the itemized statements required by section 4063, subdivision (b) does not waive that parent's right to collect the other parent's share of add-on health care expenses. Instead, subdivision (c) of section 4063 allows the court to "award filing costs and reasonable attorney[] fees," or

---

[7] In these documents, as well as in her September 2010 motion, Marcus contended that she was unable to document her payment of health care expenses for the child because Bareket, who paid for the child's health insurance, had declined to provide her with copies of the health insurer's explanation of benefits statements for the child. Marcus did not need the explanation of benefits statements, however, in order to know the amount *she herself* had been required to pay out of her own pocket for the child's medical care. Obviously, Marcus could seek reimbursement from Bareket for his share of the child's uninsured health care expenses only to the extent she had actually paid them. Accordingly, Bareket's failure to provide Marcus with copies of the explanation of benefits statements does not justify Marcus's failure to provide documentation of her own payments in a timely fashion.

to exercise its powers under section 290,[8] "if it finds that either party acted without reasonable cause regarding his or her obligations." (§ 4063, subd. (c); see *In re Marriage of Rothrock* (2008) 159 Cal.App.4th 223, 236–237.) In the present case, the trial court made no finding that Marcus had acted without reasonable cause, and even if it had, the remedy would not have been to deny Marcus's motion with respect to the health care add-on expenses.

Accordingly, we vacate the May 2012 order insofar as it denied Marcus the right to reimbursement from Bareket of his 50 percent share of the child's uninsured health care expenses accrued between June 27, 2006 (the day after the filing of the June 2006 stipulation) and April 30, 2012, inclusive. To the extent Marcus has established or can establish that prior to May 1, 2012, she provided Bareket (either informally or as an attachment to a court filing) with documentation showing that she had actually paid such costs, then Marcus remains entitled to be reimbursed for half the amount actually paid (except as to payments for which Bareket has already reimbursed her for his share).

On remand, the trial court is directed to determine the amount due to Marcus in accordance with the foregoing discussion. If, in the future, Marcus seeks payment of Bareket's share of additional uninsured health care costs incurred at any time, and does so in a manner that does not comply with section 4063, subdivision (b), she remains subject to the sanctions permitted by section 4063, subdivision (c).

### B. "Withholding" of Child Support Based on June 2006 Stipulation

#### 1. Generally

Marcus's second argument on appeal is that the trial court improperly "withheld" child support on the basis of the June 2006 stipulation. This argument does not make sense in the context of the trial court's treatment of child support from 2010 onward, because the trial court *granted* Marcus's motion to modify the basic child support amount set by the June 2006 stipulation from the year 2010 onward, *without* requiring Marcus to

---

[8] Section 290 provides that any judgment or order under the Family Code may be enforced "by any . . . order as the court in its discretion determines from time to time to be necessary."

prove that Bareket's income exceeded the threshold set by the June 2006 stipulation. Moreover, in setting the new amounts, the court did not rely on the June 2006 stipulation, but awarded guideline support as calculated by a computer program, printouts from which were attached to the order. The court also made clear at the hearing that its May 2012 order, not the June 2006 stipulation, would govern going forward. Thus, Marcus's argument on this point necessarily applies only to the aspects of the trial court's order that did rely on the 2006 stipulation, that is, the retrospective review of child support for the years 2008 and 2009, and the issue of discretionary add-ons.

Marcus also contends, without limiting her argument to the years 2008 and 2009, that the trial court's "only reason" for the amounts of child support established by the May 2012 order was the June 2006 stipulation. This is inaccurate. Both the order and the trial court's remarks at the May 1, 2012 hearing make clear that the court relied on the June 2006 stipulation *only* with respect to the years 2008 and 2009, and the issue of discretionary add-ons. Even as to the latter issue, the order says only that the June 2006 stipulation was "take[n] . . . into consideration," not that it was the sole reason for the court's order.

### 2. Basic Child Support for 2008 and 2009

With respect to the retrospective review of basic child support for 2008 and 2009, the trial court did rely on and enforce the June 2006 stipulation. That is, the court declined to revisit the amount Bareket paid during those years, on the ground that his income did not exceed the threshold required under the stipulation for a modification of the basic monthly child support amount.

The validity of the June 2006 stipulation, and the necessity for Marcus to file a motion in order to modify its terms prospectively, were established as law of the case in this matter by the Sixth District's unpublished opinion on one of Marcus's prior appeals. (*In re Marriage of Bareket and Marcus* (Nov. 12, 2009, H032760).) We decline to deviate from that ruling, as Marcus has not provided any argument or authority that the doctrine of law of the case does not apply here. Because Marcus did not file a motion to modify child support until December 2009, the trial court did not err in enforcing the

June 2006 stipulation with regard to Bareket's child support obligations for the years 2008 and 2009.

### 3. Discretionary Add-Ons

Marcus contends that the trial court "fashioned an order for discretionary [add-on] support" and then "rescinded this support on the basis of the parties' 2006 agreement." In support of this contention, Marcus cites a portion of the transcript of the May 1, 2012 hearing in which the court asked Marcus about her income in 2011, and Marcus explained that she was attending school in order to obtain a license she needed to pursue her career. In response, the trial judge said he understood, and then said, "In regard to add ons [*sic*] and so forth you have the private school, all of the expenses that you listed average about $1200 a month plus or minus." Marcus confirmed that this was correct. The court then indicated that it was about to rule on Marcus's motion, but Bareket asked if he could address the court, and in response, the court indicated that a break in the proceedings was necessary before Bareket could make his comments.

We see nothing in the cited portion of the reporter's transcript indicating that the court ever announced an intention to award discretionary add-on support to Marcus and then withdrew it, as opposed to simply noting that her income and expense declaration indicated she was paying private school tuition. Accordingly, we disregard Marcus's argument as unsupported by the record.

### C. Determination of Bareket's Income

Marcus argues in two separate sections of her opening brief that the trial court abused its discretion in determining Bareket's income for child support guideline purposes. Marcus contends that in computing guideline support, the trial court erred by failing to include in Bareket's income the following items: (1) Bareket's unexercised stock options in the privately held company for which he works; (2) Bareket's deferred compensation; (3) cash gifts Bareket received from family members; and (4) interest and dividend income reported on Bareket's tax returns. Marcus also contends that the court erred in calculating support based on Bareket's projected average monthly income for 2012, rather than on his actual year-to-date income.

12

Our standard of review on these issues is a variant of the abuse of discretion standard. "A trial court's determination to grant or deny a request for modification of a child support order will be affirmed unless the trial court abused its discretion, and it will be reversed only if prejudicial error is found from examining the record below. [Citation.] 'We observe, however, that the trial court has "a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . ." [Citation.] Furthermore, "in reviewing child support orders we must also recognize that determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. . . ." [Citation.] In short, the trial court's discretion is not so broad that it "may ignore or contravene the purposes of the law regarding . . . child support. . . ." [Citation.]' [Citation.] Moreover, to the extent that the trial court's decisions reflect an interpretation of the statutory definition of income for child support purposes, this is a question of law that we review de novo. [Citations.]" (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371–1372 (*Pearlstein*).)

### 1. Stock Options

In support of her contention that the trial court abused its discretion in excluding the value of unexercised stock options when determining Bareket's income in the present case, Marcus relies primarily on *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87 (*Kerr*) and *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269 (*Cheriton*). Both of these cases are distinguishable.

In *Kerr*, *supra*, 77 Cal.App.4th 87, a father appealed from the trial court's orders awarding spousal and child support in connection with the dissolution of his marriage. The father worked for a publicly held company, and during the marriage, he had regularly received options for the company's stock as part of his compensation. The parties had used the options to produce substantial income over and above the father's salary. (See *id.* at p. 91.) The trial court included in its child support award a provision requiring the father to transfer to his former wife, as child support, 15 percent of the beneficial ownership in any future stock options that the father actually exercised. The father

13

appealed. He acknowledged that treating the options as part of his compensation for child support purposes was proper, but objected to the trial court's use of a fixed percentage, on the ground that it was not based on the needs of the children. (*Id.* at p. 92.) The appellate court agreed, holding that the father's income from stock options was part of his overall compensation for child support purposes, but remanding for reconsideration of the percentage in relation to the children's needs and the parents' standard of living. In so doing, the court indicated that "a percentage award based on the *realized income from the exercise of stock options* would be permissible, as long as the court sets a maximum amount that would not exceed the children's needs." (*Id.* at p. 97, italics added.)

*Cheriton* also involved a father who worked for a publicly held company that awarded him stock options as part of his compensation. After the dissolution of his marriage, the father *exercised* the options, and then *sold* the shares of stock he had obtained by so doing. He sold the stock at a price significantly higher than what he paid for it under the option agreement. The court held that the father's profit from the sale should have been taken into account as part of the father's income. (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 286–289.) The court did *not*, however, hold that the value of *unexercised* options should have been treated as part of the father's income. As Division Two of this court noted in *Pearlstein*, *supra*, 137 Cal.App.4th 1361, the *Cheriton* opinion should not be "read [so] broadly as [to] authoriz[e] trial courts to treat not just an imputed income stream, but the entire principal value of a support obligor's assets, including any unrealized gain attributable thereto, as income for child support purposes." (*Id*. at pp. 1373–1374, fn. 10, italics omitted.)

In the present case, the company for which Bareket works is privately held, which limits the market for any stock in the company that he would obtain if he exercised his options. Marcus's briefs on appeal point to no evidence in the record that Bareket has in fact sold any shares in the company, much less realized any gain from such a sale. Moreover, there is no evidence in the record as to what the price would be if Bareket did conduct such a sale. Accordingly, the value of Bareket's stock options remains both

14

speculative and unrealized. Both *Kerr*, *supra*, 77 Cal.App.4th 87, and *Cheriton*, *supra*, 92 Cal.App.4th 269 are distinguishable on that basis, because in both of those cases, what was treated as income was not the *unrealized value* of the support-paying parent's *unexercised* options in a *privately held* company, but the cash the parent received from the sale of stock in a publicly held company obtained through exercise of the options.

Marcus has not identified in her briefs on appeal any authority that requires a court to include the value of unexercised stock options issued by privately held companies in a parent's income for child support purposes. Moreover, the Sixth District Court of Appeal has *twice* rejected Marcus's argument to the contrary. (*In re Marriage of Bareket* (Apr. 18, 2006, H028332); *In re Marriage of Bareket and Marcus* (Nov. 12, 2009, H032760).) Those rulings are the law of the case in this matter, and Marcus has neither argued otherwise nor persuaded us that we should deviate from them.

### 2. Deferred Compensation

As support for her argument that the trial court erred in failing to include deferred compensation[9] in computing Bareket's income, Marcus relies on a document entitled "Waiver and Release" by which Bareket waived his right to exercise certain stock options in order to facilitate an investment in the company by a third party. In connection with the same investment, Bareket received a letter from the chief financial officer of his employer indicating that the company would pay Bareket a bonus of up to $289,812, in three installments: $129,601 to be paid on December 31, 2009; $129,174 on February 26, 2010; and an additional sum of up to $31,037 to be paid upon release of certain escrow funds.

With respect to the $129,601 portion of the bonus paid in 2009, the record reflects that the trial court acknowledged that it should be considered in determining whether Bareket's income in 2009 exceeded the threshold for modification set by the June 2006

---

[9] Marcus also argues that Bareket's stock options constitute deferred compensation, but we have dealt with stock options separately in the preceding section.

stipulation. The court declined, however, to include the remaining amounts, totaling up to $160,211, in Bareket's 2009 income for this purpose.

In the trial court, Marcus objected on the ground that the June 2006 stipulation required income to be counted in the year it was earned, not the year it was paid. Our reading of the June 2006 stipulation does not disclose any such provision. Marcus also argued that Bareket manipulated the timing of the payments so as to keep his 2009 income below the modification threshold. Marcus has not pointed to any evidence in the record supporting that contention, however. Moreover, the trial court took the 2010 bonus payments into account in computing Bareket's 2010 income for child support purposes. Thus, the trial court did not abuse its discretion in allocating the bonus payments to the years in which they were paid, rather than to the year 2009 in their entirety.

### 3. Gifts from Family

With respect to cash gifts that Bareket received from his family, the trial court had discretion whether to treat them as income, given that the parties' child was not receiving public assistance, and her basic needs were being met. "[T]he principal amount of a gift, inheritance, or lump sum personal injury award need not be treated as income for child support purposes, at least where, as here, the child is not receiving public assistance. [Citations.]" (*Pearlstein*, *supra*, 137 Cal.App.4th at p. 1373, citing *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1451, 1453–1454 [where support obligor's actual income was sufficient to cover minimum basic needs of child, trial court did not err in declining to consider entire lump sum inherited by support obligor as income]; *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 529 [inter vivos gift not income for support purposes].) Nothing in the record or in Marcus's briefs on appeal persuades us that this discretion was abused in the present case.

### 4. Taxable Interest and Dividend Income

Marcus argues that the trial court erred in excluding interest and dividends from Bareket's income in making its child support computations. Bareket's tax returns for 2009, 2010, and 2011 are in the record on appeal. His interest and dividend income for

16

2009 was just over $1,100. This amount was not sufficient to take him over the modification threshold under the June 2006 stipulation. Accordingly, Marcus was not prejudiced by the trial court's failure to include it in Bareket's income.

Similarly, Bareket's 2010 and 2011 tax returns show only de minimus amounts of interest and dividends—$1,628 in 2010, and $1,529 in 2011. Any increase in the basic monthly support amount that would have resulted from the inclusion of these amounts in Bareket's income is more than offset by the trial court's discretionary decision to deny him hardship exemptions for his stepchild and his two children from his subsequent marriage. Accordingly, we decline to require the court to revisit its child support calculations based on the exclusion of these minimal amounts from Bareket's income.

### 5. *Projected Average Monthly Income*

Bareket prepared an income and expense declaration dated April 7, 2012, to which he attached his pay stubs for the months February and March, 2012. These pay stubs showed that Bareket's gross regular bimonthly pay rate was $8,583.34 (that is, $17,166.68 per month), and that in addition, he had received a total of $119,000 in bonuses during the period from January 1, 2012 through March 30, 2012. On Bareket's income and expense statement, he stated, consistently with his pay stubs, that his average monthly income was $17,167. He also stated that he earned an *average* of $18,792 per month in commissions and bonuses, for a total monthly income of $35,959. The trial court's calculation of child support for the years 2011 onward attributed to Bareket a slightly higher monthly income of $36,823.

Citing Bareket's March 30, 2012 pay stub, Marcus argues that Bareket's actual monthly income was $56,943. This calculation necessarily assumes that the same $119,000 in bonus income that Bareket earned during the first three months of 2012 would continue to be paid every three months during the remainder of the year, which would result in an annual income of $683,316. Other documents in the record, including Bareket's income and expense declaration and his tax returns, make clear that Bareket's annual salary income (including bonuses) was considerably lower than that figure; in 2011, for example, it was $429,366 (an average of $35,780.50 per month). Accordingly,

17

Marcus's argument that the trial court should have attributed to Bareket a monthly income of $56,943 relies on an assumption about Bareket's bonuses that is flatly contrary to the evidence. We find no error or abuse of discretion in the trial court's order as to this issue.

### D. Denial of Request for Attorney Fees under Section 2030

In a request for an order to show cause that was filed on December 2, 2011, but not heard until May 1, 2012, Marcus requested $50,000 for need-based attorney fees and costs under section 2030. The record is unclear as to why the trial court did not address the request more promptly. In any event, in the May 2012 order, the trial court denied Marcus's request, without making the findings required under section 2030, subdivision (a)(2). Marcus contends this was error.

We review a trial court's order on a request for attorney fees under section 2030 for abuse of discretion. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 283.) However, " ' "It is well established in California that, although the trial court has considerable discretion in fashioning a need-based fee award [citation], *the record must reflect that the trial court actually exercised that discretion, and considered the statutory factors in exercising that discretion*." [Citation.]' [Citation.]" (*In re Marriage of Lynn* (2002) 101 Cal.App.4th 120, 134, original italics.) Where the record "does not leave [the appellate court] any room to conclude the [trial] court exercised its discretion as the law requires" (*ibid.*), the trial court's order must be reversed.

Here, the only explanation given by the trial court for its denial of Marcus's request for attorney fees was its remarks at the hearing that fees would be "denied because the matter is proceeding to trial as we speak," and that "[w]e are set for trial today." Section 2030 does not permit a trial court to deny need-based attorney fees based on the fact that the request for those fees is still pending, and has not yet been adjudicated, at the time of a trial or evidentiary hearing. Rather, section 2030, subdivision (a)(1) requires the court to "ensure that each party has access to legal representation, including access early in the proceedings." Similarly, section 2030, subdivision (a)(2) provides that "A party who lacks the financial ability to hire an

18

attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner *before* proceedings in the matter go forward." (Italics added.)

Accordingly, it appears that in denying Marcus's request for attorney fees, the trial court failed to exercise its discretion in the manner required by section 2030. However, Marcus did not in fact incur any attorney fees in connection with the proceedings, so this error does not result in Marcus being entitled to any award of fees in connection with the already-completed proceedings leading up to the orders from which this appeal was taken.

Moreover, Marcus has not shown with specificity how she was prejudiced by the trial court's denial of attorney fees with respect to any other aspect of the proceedings. Indeed, the trial court granted much of the relief Marcus sought, including increasing the amount of child support and setting aside the child support provisions of the June 2006 stipulation with respect to the years 2010 onward. As to the matters as to which Marcus did not prevail, our review of the record has not revealed any issue as to which it appears Marcus could have obtained a better result if she had been represented by counsel. Accordingly, we decline to reverse the May 2012 order on the basis of the trial court's error in denying Marcus's request for attorney fees.

### E. Denial of Right to Present Evidence

As noted earlier, at the hearing in the San Mateo County Superior Court on May 1, 2012, Marcus appeared by telephone. Prior to the hearing, Marcus filed a request for judicial notice, accompanied by a set of documents of which she requested the court take judicial notice. At the hearing, the court informed Marcus that "[m]ost of the items [she] requested that [the court] take judicial notice of are not items that the Court can take judicial notice of." In addition, the court indicated that although it had "three and a half volumes of documents" before it for the May 1, 2012 hearing, it did not have the entire 35-volume record that had accumulated in the Santa Clara County Superior Court prior to

19

the transfer of venue to the San Mateo County Superior Court as to child support issues only.

Marcus now contends, in general terms, that the trial court denied her the right to present evidence, and thus denied her a fair hearing. However, Marcus's opening brief does not identify any specific document of which the trial court *erroneously* declined to take judicial notice under the applicable portions of the Evidence Code, nor does she explain how the exclusion of any such document was prejudicial to the outcome of the hearing. " 'The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.' [Citations.]" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317; see also Evid. Code, § 354.) "A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.]" (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 751.) Marcus has made no such showing in the present case.

In any event, Marcus subsequently filed the documents she wished to rely upon as exhibits to her motion to correct, and the trial court's ruling denying that motion indicated that it had considered all of the evidence. Our own thorough review of the record, which includes many of the documents on which Marcus sought to rely, has not disclosed any prejudice to Marcus from the trial court's failure to consider, at the May 1, 2012 hearing, the documents Marcus subsequently filed in support of her motion to correct. Accordingly, we are not persuaded that any evidentiary error the trial court may have committed constitutes grounds for reversal.

## IV. DISPOSITION

The trial court's order entered May 1, 2012, is vacated, solely insofar as it denied Marcus the right to reimbursement from Bareket of his 50 percent share of the child's uninsured health care expenses accrued between June 27, 2006, and April 30, 2012, inclusive. To the extent Marcus has established or can establish that prior to May 1,

20

2012, she provided Bareket (either informally or as an attachment to a court filing) with documentation showing that she had actually paid such costs, then Marcus remains entitled to be reimbursed for half the amount actually paid (except as to payments for which Bareket has already reimbursed her for his share). On remand, the trial court is directed to determine the resulting amount due to Marcus.

In all other respects, the trial court's order entered May 1, 2102, is affirmed. The trial court's order entered July 24, 2012, also is affirmed. The parties shall each bear their own costs on appeal.

_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.