Filed 5/9/23  Marriage of McCarden and Johnson
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Marriage of McCARDEN and JOHNSON. | B310047 |
| | (Los Angeles County Super. Ct. No. SD034570) |
| KHRISTA M. McCARDEN, Appellant, v. ALTON TIMOTHY JOHNSON, Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lawrence P. Riff, Judge.  Affirmed.

Law Offices of Lisa R. McCall, Lisa R. McCall, Erica M. Baca; Khrista M. McCarden, in pro. per., for Appellant.

Alton Johnson, in pro. per., for Respondent.

_____

Khrista M. McCarden appeals from a family law judgment, challenging the judgment's (1) real property division, (2) personal property valuation, (3) child support orders, and (4) reimbursement orders. We affirm the judgment.

## BACKGROUND

We take the facts from the trial court's statement of decision on reserved issues.

Khrista and Alton Timothy Johnson were married in December 2012 and separated 34 months later in September 2015.[1] Their daughter was born in August 2015.

### A. Accounts and Income

During the marriage the parties maintained six bank accounts:

Khrista's Citibank account ending in 2250 (Khrista's 2250 account);

Alton's Chase Bank account ending in 9346 (the 9346 account);

Alton's Chase Bank account ending in 1057 (Alton's 1057 account);

a Chase Bank account ending in 0539 owned by California Coastal Assets II, an LLC whose sole member was Alton (California Coastal Assets II 0539 account);

a jointly owned Chase Bank ending in 2532 (joint account 2532); and

---

[1] We will refer to the parties by first name for clarity, not out of familiarity or disrespect.

a jointly owned Ally Bank account ending in 047 (joint Ally account 047).[2]

Khrista was a law professor whose salary was paid in well-documented increments. She deposited her salary into the 9346 account. Khrista periodically updated her income and expense declaration, reflecting an income from 2016 to 2018 of around $12,250 per month.

Alton was in the business of making speculative real estate transactions, buying residential properties, and renovating and selling them in short turnaround times. As part of this business, Alton moved money around via various entities and through various bank accounts, sometimes refinancing properties at the eleventh hour to stave off an impending foreclosure. He derived his income from the withdrawal and redirection of equity from his properties. The trial court characterized this as a " 'living-near-the-edge' business existence." Alton periodically updated his income and expense declaration, reflecting an income of around $2,000 per month from 2016 to 2018.

## B.    Real Property

Before the marriage, Alton separately owned real property at four locations. During the marriage he sold three of these properties and used the proceeds to buy property on Tuna Canyon Road in Malibu.

### 1.    Hillview

Alton acquired property at 4356 Hillview Drive in Malibu in March 2012 (Hillview). The original mortgage was a $737,047

---

[2] Another LLC, California Coastal Assets (not to be confused with California Coastal Assets II), was Alton's nominal employer.

3

30-year fixed mortgage, with a monthly mortgage payment of $3,465.87 and a monthly impounded mortgage total of $5,232.21 as of the date of marriage. Hillview was rented out during part of the marriage.

Alton sold Hillview in November 2014 for $1.7 million, depositing the net proceeds of $888,000 into the California Coastal Assets II 0539 account. Alton later transferred these proceeds into joint account 2532.

### 2. Ocean View 1

Johnson acquired property at 26608 Ocean View Drive in Malibu in November 2012 (Ocean View 1).

During the marriage, mortgage payments on Ocean View 1 were made from the 9346 account.

The property sold nine months into the marriage, in August 2013, and the $432,000 in proceeds were deposited into Alton's 1057 account.

### 3. Ocean View 2

Alton acquired property at 26616 Ocean View Drive in Malibu in November 2012 for $450,000, with a $275,000 mortgage (Ocean View 2).

He refinanced the property, increasing the original trust deed by $50,000, and took out a second trust deed for about $100,000, bringing the total mortgages to $425,000. In September 2014, Alton transferred Ocean View 2 to California Coastal Assets II, LLC. During marriage, mortgage payments were made on Ocean View 2 from the 9346 account.

In December 2014, Alton used part of the $888,000 in proceeds from the Hillview sale to pay off the Ocean View 2 mortgage.

4

In January 2015, California Coastal Assets II sold Ocean View 2, receiving $849,000 in sale proceeds that were put into the California Coastal Assets II 0539 account.

The parties' tax returns showed a $199,808 increase in cost basis for Hillview, $148,471.10 for Ocean View 1, and $314,253 for Ocean View 2, which Khrista testified reflected capital improvements made with community funds. However, the trial court expressly discredited this testimony.

### 4. Swenson

Some time before the marriage, Alton bought what the parties refer to as the "Swenson" property (Swenson). During the marriage, Alton paid down $109,836 of the principal on the Swenson mortgage from the 9346 account.

### 5. Tuna Canyon

In 2015, Alton transferred $500,000 and $350,000 from the California Coastal Assets II 0539 account to the joint Ally account 047, funds that had resulted from the Hillview and Ocean View 2 sales, respectively.

In August 2015 (during the marriage), Alton used newly transferred funds in the joint Ally account 047 to make a $497,668 down payment on Tuna Canyon, taking out a $1 million mortgage. The joint Ally account 047 thereafter had a $356,196 balance.

In November 2018, Alton sold Tuna Canyon, without Khrista's knowledge, for $2.1 million, yielding proceeds of $192,674.64. Alton transferred the proceeds to an account owned by his mother, along with $100,000 from the joint Ally account 047, also without Khrista's knowledge.

5

## C.    Engagement Ring

Alton bought Khrista an engagement ring. He testified the ring originally appraised for $62,000, but to obtain an $80,000 insurance policy, Alton persuaded the jeweler to appraise the ring for $80,750. The court characterized Alton's maneuvering with respect to the ring as "potential insurance fraud" and "strong-arming."

When Khrista became pregnant, her fingers swelled to the point that she could not wear the ring, so Alton took it for safekeeping. Khrista never saw it again.

## D.    Child Support

During divorce proceedings, the Los Angeles County Child Support Services Department (CSSD) opened a case to calculate child support. On May 17, 2016, the CSSD filed a notice regarding payment of support, and on January 31, 2018, filed a stipulation and order on child support, reserving retroactive jurisdiction.

## E.    Trial

On October 23, 2015, Khrista petitioned for dissolution and Alton petitioned for legal separation. The cases were consolidated, and Alton's petition was deemed to be his response to the dissolution case. The parties thereafter engaged in almost five years of what the court characterized as "grossly disproportionate" litigation in a "ceaseless conflict" over which the parties were "plainly . . . impoverishing themselves."

As pertinent here, Khrista contended: (1) Tuna Canyon was community property; (2) the engagement ring was worth $100,000; (3) Alton breached his fiduciary duty by transferring funds to his mother; and (4) Khrista was entitled to retroactive child support, which could be determined only by CSSD.

6

The matter was tried over the course of seven days in department C-77 of the Los Angeles Superior Court, the Honorable Lawrence Riff, Judge presiding.  The court issued a tentative decision and proposed statement of decision, to which Khrista filed objections, and on August 13, 2020, issued a statement of decision on reserved issues.  Below, we will discuss evidence presented at trial as it becomes pertinent.  The court issued its final judgment on October 13, 2020.

The judgment found that Khrista failed to meet her burden of proof that the community had an interest in the five real properties described above, and awarded the entire sales proceeds of Tuna Canyon to Alton as his separate property.  The court alternatively awarded Alton those sales proceeds pursuant to Family Law Code section 2640 on the ground that the $498,000 down payment was traceable to Alton's separate funds, and the proceeds were insufficient to fully reimburse him for this payment.

The court found that the second appraisal Alton received of Khrista's engagement ring, for $80,750, was unreliable as to the ring's value, and the cost of acquisition and first appraisal were more reliable indicators of the value.  It thereupon found the ring was worth $62,000 (which it awarded to Khrista).

The court denied Khrista's request for child support retroactive to December 29, 2015, and ordered her to pay Alton $409 per month going forward.  Finally, the court made reimbursement orders and found that Khrista failed to prove Alton breached a fiduciary duty.

Khrista timely appealed.

7

**DISCUSSION**

Khrista contends (1) the court's award of child support and findings regarding Tuna Canyon and the engagement ring were unsupported by substantial evidence, (2) the court lacked jurisdiction to award child support, and (3) the court abused its discretion in failing to order retroactive child support, failing to find Alton breached a fiduciary duty, and issuing certain reimbursement orders.

## A.     Tuna Canyon

Khrista contends no substantial evidence supported the court's finding that Tuna Canyon was Alton's separate property, and she should have been awarded a community interest of one-half of the $192,674.64 realized from its sale.  We disagree.

Property acquired before marriage is separate property. (Fam. Code, § 770, subd. (a)(1).)[3]

Property acquired during marriage is presumed to be community property.  (§ 760.)  This is a rebuttable presumption affecting the burden of proof, and may be overcome by "tracing the source of funds used to acquire the property to separate property."  (*In re Brace* (2020) 9 Cal.5th 903, 914*; In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 864.)

The community property presumption may be overcome by direct tracing.  " '[S]eparate funds do not lose their character as such when commingled with community funds in a bank account so long as the amount thereof can be ascertained.  Whether separate funds so deposited continue to be on deposit when a withdrawal is made from such a bank account for the purpose of

_____

[3] Undesignated statutory references will be to the Family Code.

8

purchasing specific property, and whether the intention of the drawer is to withdraw such funds therefrom, are questions of fact for determination by the trial court.' " (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 612.)

The community property presumption may also be overcome by considering family expenses. We presume that "family expenses are paid from community funds. [Citations.] If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds." (*In re Marriage of Mix, supra,* 14 Cal.3d at p. 612.)

" 'If funds used for acquisitions during marriage cannot otherwise be traced to their source and the husband who has commingled property is unable to establish that there was a deficit in the community accounts when the assets were purchased, the presumption controls that property acquired by purchase during marriage is community property.' " (*In re Marriage of Mix, supra,* 14 Cal.3d at p. 612.)

Finally, the community property presumption may be overcome by "recapitulation of the total community expenses and income throughout the marriage." (*See v. See* (1966) 64 Cal.2d 778, 783.) Like exhaustion, this method, instead of looking at what the family's expenses were at a given point in time, allows a separate property proponent to show that, over the course of the marriage, community expenses exceeded community income. However, this method is only allowed if records are not available through no fault of the party claiming the separate property. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 330.)

9

Whether the community property presumption has been overcome is a question of fact for the trial court, and must be supported by substantial evidence. (*In re Marriage of Mix, supra*, 14 Cal.3d at p. 611.)

" 'Substantial evidence . . . is not synonymous with "any" evidence.' Instead, it is ' " 'substantial' proof of the essentials which the law requires." ' [Citations.] The focus is on the quality, rather than the quantity, of the evidence. 'Very little solid evidence may be "substantial," while a lot of extremely weak evidence might be "insubstantial." ' " "The ultimate test is whether it is reasonable for the trier of fact to make the ruling in question in light of the whole record. [Citation.] 'A formulation of the substantial evidence rule which stresses the importance of isolated evidence supporting the judgment, . . . risks misleading the court into abdicating its duty to appraise the whole record.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651-652.)

Here, Khrista's claim on Tuna Canyon derives from her income deposited into the 9346 account, thusly:

Tuna Canyon was purchased with a $497,668 down payment from the joint Ally account 047;

That account was funded with $850,000 from the California Coastal Assets II 0539 account;

The California Coastal Assets II 0539 account was funded by proceeds from the Hillview, Ocean View 2 and Ocean View 1 sales;

Hillview, Ocean View 2 and Ocean View 1 were originally separate property, but mortgage payments and an alleged $199,808 in capital improvements for Hillview and $314,253 for Ocean View 2 (and an uncertain amount for Ocean View 1) were

10

paid during the marriage from the 9346 account. (The Ocean View 2 mortgage was also paid down with proceeds from the Hillview sale.)

Khrista argues that because her income went into the 9346 account, which funded Hillview, Ocean View 2 and Ocean View 1, the sales of which funded the California Coastal Assets II 0539 account, which was used to fund the joint Ally account 047, with which Tuna Canyon was purchased, her income can be traced to Tuna Canyon, rendering it community property.

However, Khrista testified that her income, all of which was deposited into the 9346 account, also supported the family, and Alton testified (and the trial court credited) that Khrista's contribution was insufficient to meet all the family's living "concurrent" expenses. It was undisputed that Alton's regular earnings, if any, were modest at best, and thus his contribution to the family's living expenses, if any, was correspondingly modest. Based on this evidence, the court found that "this couple, during their short marriage, lived a lifestyle that required the exhaustion of Khrista's paycheck on family expenses when deposited into commingled accounts."

This evidence supported the court's finding that all community income in the commingled 9346 account was exhausted by family expenses. There was thus a deficit in the community portion of the account whenever contributions were made to Hillview, Ocean View 2 and Ocean View 1, and when Tuna Canyon was purchased, and all funds remaining in that account at the time of those contributions and that purchase were necessarily separate funds. The court's conclusion that Tuna Canyon was Alton's separate property is thus supported by substantial evidence.

Khrista entirely ignores this evidence and the court's finding that living expenses exhausted community funds. She recites the evidence presented at trial that was in her favor, asserts as fact several conclusions that the court expressly rejected (for example that an increased basis as reflected in tax returns reflects capital improvements paid for with community funds), and invites us to draw inferences contrary to those the trial court drew from the totality of the evidence.

For example, Khrista sets forth in detail each property's purchase and sale price, mortgage, rent, and cost of improvements; traces the movement of money between various accounts (and Alton's mother); details, her and Alton's respective incomes; and argues that because property expenses were substantial and Alton's income negligible, no separate property income was available to pay property expenses, and any such expenses must have been paid for with community funds. But this ignores two contrary findings the court made: (1) Alton derived income from the withdrawal and redirection of equity from his properties; and (2) living expenses exhausted Khrista's income. Khrista makes no attempt to refute these findings, and does not contend they were unsupported by evidence.

These findings, which were based on Alton's and Khrista's testimony, supported the court's characterization of Tuna Canyon as separate property.

Relying on *Higinbotham*, Khrista argues Johnson was precluded from using the recapitulation tracing method to rebut the community property presumption because he made no attempt to show that pertinent records were unavailable. The point is irrelevant because Johnson did not use that method. The recapitulation method considers whether community expenses

12

exceeded community income over the course of the marriage. Here, Johnson showed, and the court credited, that the family's expenses exceeded community funds month-to-month.[4]

## B. Engagement Ring

Khrista contends no substantial evidence supported the court's valuation of her engagement ring at $62,000 rather than $100,000. We disagree.

In marital dissolution proceedings, property is divided according to its fair market value. The fair market value of personal property is the price a willing buyer would have paid to a willing seller assuming there is no pressure on either one to buy or sell, and the buyer and seller are fully informed of the condition and quality of the property. (Rev. & Tax. Code, § 110.)

Here, the undisputed evidence showed that the engagement ring was first appraised at $62,000. This supported the trial court's finding that the ring was worth $62,000.

Khrista argues the first appraisal was an unreliable "scintilla of evidence," and the only reliable evidence comprised the second appraisal, for $80,000, and Alton's declaration that the ring was worth $100,000.

Evidence reliability is the trial court's province. We may not make reliability determinations on appeal.

---

[4] In his respondent's brief, Johnson argues without citation to the record that Khrista sought bankruptcy protection to forestall the judgment in this case. He does not argue (nor does Khrista) that any such filing deprives us of jurisdiction to hear this appeal. Absent a record citation the argument, whatever it is, is forfeited.

## C. Child Support

As noted above, the trial court denied Khrista's request for child support retroactive to December 29, 2015, and ordered her to pay Alton $409 per month going forward.

### 1. Jurisdiction

Khrista first argues the trial court lacked jurisdiction over child support because the court was divested of jurisdiction by subdivision (a) of section 4251, which obligated the superior court to provide sufficient commissioners to hear child support claims (called Title IV-D cases) and states that such claims "shall be referred for hearing to a child support commissioner." She argues the trial court was also divested of jurisdiction by Los Angeles Superior Court Local Rule 5.24(b) (Local Rule 5.24), which provides that child support claims "shall be filed" in Title IV-D courtrooms. We disagree with both arguments.

The superior court has jurisdiction in proceedings under the Family Code. (§ 200.) "There is but one Los Angeles Superior Court." (*People v. Dependable Ins. Co.* (1988) 204 Cal.App.3d 871, 874; Cal. Const., art. VI, § 4.) " 'The jurisdiction of causes is vested by the constitution in the [superior] *court*, not in any particular judge or department thereof.' " (*Magallan v. Superior Court* (2011) 192 Cal.App.4th 1444, 1453.) " 'Transferring a cause for trial or disposition from one of those departments to another does not effect a change or transfer of the jurisdiction of that cause; that remains at all times in the court as a single entity.' " (*Id.* at pp. 1453-1454.)

Section 4251 and Local Rule 5.24 effect an administrative redistribution of court business amongst court departments. An administrative redistribution of court business does not deprive any department of jurisdiction.

## 2. Retroactive Child Support

At trial, Khrista made a claim for child support retroactive to 2016, i.e., for the years 2016, 2017, and 2018. She supported her 2016 claim with DissoMaster calculations which assumed that capital gains Alton listed on his 2015 tax return constituted disposable income.[5] For example, Alton's monthly income in 2016 was zero, in 2017 was approximately $2,567, and in 2018 was approximately $3,000, but Khrista calculated 2016 support based on Alton's capital gains of $108,814 (reflected on his 2015 return but applicable to 2016). For her 2017 claim, Khrista offered a commercial loan application in which Alton declared his monthly income was $22,000, which the court stated it "might be inclined to hold Alton to" had there been evidence as to Khrista's income during 2017.

No party submitted tax returns for either party for 2017 or 2018, from which the court inferred the returns would not have assisted Khrista's position. (See Evid. Code, § 412.)

The court thereupon found there was insufficient credible evidence to make a guideline child support modification. With respect to capital gains Alton received in 2016, the court found "Alton did reinvest most or all such sums even if he or his company did realize gain," rendering them unavailable for support. With respect to Khrista's 2017 income, the court found

---

[5] "DissoMaster is a computer software program widely used by courts to set child support and temporary spousal support." (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1578, fn. 4.) The goal is to calculate support that comports with the uniform child support guideline, sections 4050-4076, or "guideline support."

15

that Khrista's DissoMaster assumptions set forth in her proposed statement of decision were too speculative in light of the fact that she could have presented more direct evidence but did not. It therefore declined to award retroactive child support.

Khrista contends the court abused its discretion in finding insufficient evidence supported her DissoMaster calculations. This is true, she argues, because her salary was always undisputed, as Alton's income and expense declarations frequently listed her income as being around $12,500 per month. We disagree.

California has a strong public policy in favor of adequate child support, which is expressed in statutes embodying the statewide uniform child support guideline. (§§ 4050-4076; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283.) The child support guideline "seeks to place the interests of children as the state's top priority." (§ 4053, subd. (e).) In determining child support under the guideline, courts must adhere to certain principles, such as "[a] parent's first and principal obligation is to support the parent's minor children according to the parent's circumstances and station of life." (*Id*. at subd. (a).) "The guideline takes into account each parent's actual income and level of responsibility for the children." (*Id*. at subd. (c).) "Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children." (*Id*. at subd. (f).)

To implement these policies, courts must calculate child support in accordance with the mathematical formula set forth in the guideline. (*In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th

at p. 284.)  A trial court may not depart from the guideline except in special circumstances.  (*Ibid.*; see §§ 4052, 4053, subd. (k).)

Here, Khrista based her 2016 claim for child support on calculations that assumed Alton's capital gains, which the court found he had reinvested, constituted disposable income.  But "the types of income specified in the [Family Code] consist of money that the support obligor actually receives, and do not include unrealized increases in the value of assets."  (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1372 (*Pearlstein*); *In re Marriage of Henry* (2005) 126 Cal.App.4th 111, 119.)  The guideline formula calculates child support based on net disposable income, not assets (*In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332; see also *Mejia v. Reed* (2003) 31 Cal.4th 657, 670 ["[s]upport payments usually are paid from present earnings, not liquidation of preexisting assets"].)

*Pearlstein* distinguished between unrealized capital gain, which includes capital assets that are reinvested into other capital assets, and realized gain, where a capital asset is sold for cash.  Unrealized capital gain does not constitute disposable income for support calculation purposes; realized gains are available for support purposes.  *Pearlstein* held, "cash represents *realized* rather than unrealized capital gain. . . .  To the extent that a support obligor has spent funds derived by liquidating his or her capital, rather than reinvesting them, the trial court acts within its discretion in considering the funds expended to be income for support purposes."  (*Pearlstein*, *supra*, 137 Cal.App.4th at p. 1376.)  However, "to the extent that" a support obligor liquidates capital "only for the purpose of reinvesting [the funds obtained] in income-producing assets, the resulting gain

[is] not income, but merely the replacement of one capital investment with another." (*Id*. at pp. 1375-1376.)

Here, Alton sold real property and used the capital gain to purchase other real property. With respect to property sales in 2016, the trial court specifically found that "Alton did reinvest most or all such sums even if he or his company did realize gain." We therefore conclude that under *Pearlstein*, the equity from the property sales in 2016 used to purchase subsequent properties was not available for child support purposes.

Regarding her 2017 and 2018 claims, for her own income Khrista apparently relied on statements made by the parties during the litigation, and failed to provide either paystubs or tax return information. The court was entitled to conclude that party statements did not constitute reliable data points upon which to base support obligations. (See *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1080 [court entitled to consider a W-2 to be better evidence of income than a party's income and expense declaration].)

We therefore conclude the trial court acted within its discretion in finding insufficient evidence supported Khrista's claims for retroactive child support.

Khrista argues the income and expense declarations were a good enough foundation for child support. But the trial court concluded otherwise, and we may not reweigh the evidence.

### 3. Prospective Child Support

The court awarded Alton prospective child support as of January 1, 2019, based on his factual inputs for the 2019 DissoMaster attached to his proposed statement of decision. Khrista argues this constituted an abuse of discretion because Alton's DissoMaster calculation "was based on IEDs, just like

Khrista's."  No citation to the record supports this claim, which we therefore deem to be forfeited.

**D.     Reimbursement Orders**

The court found Khrista removed $7,000 from the 9346 account and $90,000 from the joint Ally 047 account, which funds were Alton's separate property because of the family expense exhaustion method of tracing described above.  It ordered Khrista to reimburse Alton $97,000 for these withdrawals.  The court further found that Alton was not obligated to reimburse Khrista $25,000, for one-half of the $50,000 he withdrew from the 9346 account on September 30, 2019, three days after the date of separation.

Khrista argues these orders constituted an abuse of discretion because the accounts contained community funds.  For reasons set forth above, we disagree.  We therefore affirm the orders.

**E.     Breach of Fiduciary Duty**

Khrista claimed at trial that Alton breached fiduciary duties to her by encumbrancing and selling Tuna Canyon without her knowledge.  The court rejected the claim.  Khrista argues that based on the community property nature of Tuna Canyon, the court abused its discretion.

Because substantial evidence supported the court's finding that Tuna Canyon was Alton's separate property, we affirm the order denying Khrista's breach of fiduciary duty claim.

19

## DISPOSITION

The judgment is affirmed.  Respondent is to recover his costs on appeal.

NOT TO BE PUBLISHED

                                        CHANEY, J.

We concur:


        BENDIX, Acting P. J.


        BENKE, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.